PEOPLE v CROSS

Docket No. 125090. Submitted December 13, 1990, at Grand Rapids.
Decided January 22, 1991, at 10:20 A.M.

Charles D. Cross, Jr., was convicted of attempted prison escape following a jury trial in the Ionia Circuit Court, James L. Banks, J., and pled guilty of being an habitual offender, second offense, and was sentenced to 3 to 7½ years in prison, to be served consecutively to the sentence he was serving. The defendant appealed, claiming that the trial court erred in refusing his request for a jury instruction regarding the defense of abandonment.

The Court of Appeals *held:*

The trial court properly refused to instruct the jury with regard to the defense of abandonment. The defendant failed to prove by a preponderance of the evidence that he had voluntarily abandoned his efforts to escape.

1. Abandonment of efforts to commit a crime is an affirmative defense, and the burden is on the defendant to establish by a preponderance of the evidence that any criminal purpose had been voluntarily and completely abandoned.

2. The defense of abandonment is not available to a defendant who failed to complete an attempted crime because of unanticipated difficulties, unexpected resistance, or circumstances which increased the probability of detention or apprehension.

Affirmed.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *Gary M. Gabry,* Prosecuting Attorney, and *William E. Molner,* Assistant Attorney General, for the people.

*Donald R. Hemingsen,* for the defendant on appeal.

Before: Maher, P.J., and Sawyer and Brennan, JJ.

PER CURIAM. Defendant was convicted, following a jury trial, of attempted prison escape. MCL 750.193; MSA 28.390. Thereafter, defendant pled guilty of being a habitual offender (second offense). MCL 769.10; MSA 28.1082. Defendant was sentenced to 3 to 7½ years in prison, to be served consecutively to the sentence he was then serving. He now appeals and we affirm.

Defendant's sole argument on appeal is that the trial court erred in refusing his request for a jury instruction regarding the defense of abandonment. We disagree.

Defendant's conviction arose from an incident which occurred at the Michigan Training Unit, where defendant was incarcerated. According to the testimony of various corrections officers, defendant was apprehended as he was beginning to climb the inner fence of the prison. According to defendant's testimony, although he had initially started to climb the fence, he was off the fence but within the perimeter wire when the corrections officers arrived. Defendant's theory of the case was that he had never intended to escape, but merely was making an attempt in order to receive a misconduct citation, have his security classification changed, and be transferred to a different institution. Defendant also argues that, in any event, he had abandoned any attempt to escape prior to his apprehension. The trial court declined to give the instruction concerning abandonment, finding that it was not supported by the evidence and was inconsistent with defendant's theory that he never possessed the intent to escape, intending merely to get the misconduct citation. Therefore, the court reasoned, defendant could not have abandoned an intent which he did not possess.

First, as defendant points out, a defendant in a criminal matter may advance inconsistent claims

and defenses. *People v John Willie Williams*, 26 Mich App 218, 222; 182 NW2d 347 (1970). Thus, the mere fact that defendant's two defenses were inconsistent would not justify the refusal to give the abandonment instruction. However, the trial court is obligated to instruct with regard to a defense only where there is some evidence to support giving that instruction. See *People v Michael Fuqua*, 146 Mich App 133, 137; 379 NW2d 396 (1985). Thus, we must determine whether there was evidence on the record which would support the defense of abandonment and, therefore, have required the trial court to have given the requested instruction.

Abandonment is an affirmative defense, and the burden is on the defendant to establish by a preponderance of the evidence voluntary and complete abandonment of a criminal purpose. *People v Kimball*, 109 Mich App 273, 286; 311 NW2d 343 (1981), modified on other grounds 412 Mich 890, 891; 313 NW2d 285 (1981). The abandonment defense is not available where "the defendant fails to complete the attempted crime because of unanticipated difficulties, unexpected resistance, or circumstances which increase the probability of detention [sic, detection?] or apprehension." *Id.* at 286-287. The limitations on the abandonment defense also were stated in Dressler, Understanding Criminal Law, § 27.08, p 356:

> Abandonment by the defendant is "voluntary" when it is the result of repentance or a genuine change of heart. On the other hand, the defendant is not entitled to the defense if her motivation for withdrawal was that she feared arrest, realized that she lacked an essential instrumentality to complete the crime or for some other reason could not successfully proceed, or if she merely post-

poned her criminal endeavor until a better opportunity presented itself.

The only testimony set forth which would establish defendant's abandonment defense is the testimony of defendant himself, and that testimony is not entirely clear on the matter because his testimony appears to be designed more toward establishing the "fake escape" defense to obtain the misconduct citation than toward establishing abandonment. However, a review of defendant's testimony does indicate that the evidence fails to support a conclusion that defendant voluntarily abandoned his attempt to escape:

*A. [Defendant]*: And I bent down and I said another prayer. And an 8 Post officer was out there, and I believe she called for help. And I jogged down from that area to this area and went up under the perimeter of the fence, and the wire —got tangled up in the wire and got from up there —there was snow on the ground, and I grabbed the fence. And I seen Officer Brown, Officer Talcott and Officer—another officer coming and an officer outside the fence coming up in a truck. And the officer in the 8 Post, she was Ms. Hood, Sherri Hood, and William Brown, he always say—well, exactly what I remember, he was running, him and Talcott. Talcott was coming from this direction. I know the officers personally, and I know William Brown. And Brown stated, "Get your nigger ass away from that fence before I kill you," and he was reaching in his jacket. Like, he was ready to go home. He had on, like, a jacket, like, an overcoat, and he was reaching in his overcoat running I guess trying to scare me away from the fence because I was out of place.

*Q. [Defense Counsel]*: Okay. Now, back when you were kneeling down at the A Unit and at the point then that you headed towards the fence, what did you intend to do at that point? What was your intention?

*A.* Right then it was, like, my thoughts—I knew I could not get over those fences, and I figured, well, these people here, they can be real, real tacky and real stirring. I figured, well, I could get shot running across this field, but I was really emotional at the time, and I was ready to get shot, but I was not trying to, you know, really escape that prison because I had nowhere to go, nobody to pick me up, nothing. I was just—I was on the edge of leaving the facility, but it seemed like they would never let me go. I talked to Deputy Fuller, and Deputy Fuller tell me, "Well, you mess up one more good time and get one good—one more good ticket out of you and you're gone." So I was thinking, you know, maybe this is it. I probably can get shot, too.

\* \* \*

*A.* When I got there, I went up under the fence [sic, perimeter wire?], and I grabbed the fence. I tripped, you know. I was tangled up in the wire. And by that time, the officer outside the two fences—there was a mobile vehicle officer here, and he pulled up and his flash—his high beams were on. And I looked out and I see him get out of his truck, and he had a gun. The officers, they carry guns in the trucks, and he had a gun. And I looked at him. I looked at the 8 Post officer and I looked back, and Talcott and them is right there. And I heard the statement from William Brown, "Get your nigger ass away from the fence before I shoot you."

*Q.* Okay. Now, what were you thinking when you got to the fence?

*A.* Thinking, "Well, here I am. There's nothing I can do. And I'm gone." I figure I'm looking right across the street at MR [sic, Michigan Reformatory?]. I knew that's where they was going to take me, and they took me to MR.

\* \* \*

*Q.* Okay. Do you feel that you could have escaped?

*A.* No; huh-uh (negative).

*Q.* Okay. Now, when these officers came up to you, did you offer any resistance to them?

*A.* No. I did not resist those officers. I did not resist those officers. But I was really kind of—at the time I was kind of frightened by them because they was right there. I did hear that—I hear—I believe I did hear a shot go off, and when I got back to my unit, the guys was asking me, "Man, was they shooting at you?" I say, "I don't know." They was telling me, "We heard shots out there, man."

*Q.* Okay. Now, this resistance, you said you didn't resist them at all. Was this before or after they had gotten there?

*A.* After they go there, it was Talcott, Brown and another guy, and I just—I'm like this.

*Q.* Okay. Now—so were you on the fence at that point?

*A.* At that point, I was—I had my hands on the fence, but the fence is twice my height, you know. I couldn't get over that fence. I had my hands on the fence. I was tangled in the wire, couldn't get over there.

\*   \*   \*

*Q.* How long did it take you, estimating, to get from A Unit to the fence?

*A.* Fifteen second, ten seconds.

*Q.* And when you were at the fence, were the officers there or did it take them some time to get there after you were there? How long—what was the time sequence there with the officers?

*A.* When I got to the fence, I seen there was an officer pulling up, and I seen lights outside the fence, but I didn't know there was nobody there. He had the high beams on. And the officers were— when I got to the fence, Brown and the other officer was right about here, and I heard them yell down that way, "Get away from the fence." And Talcott was coming.

*Q.* Okay. So did you stop before the officers got there or after in terms of resistance?

*A.* When they got there, I was—when they got there, I wasn't on the fence.

*Q.* Okay.

*A.* I was not on the fence. And then told me to come from behind the perimeter, and I tried to come from behind, and then they grabbed me and threw me on the ground.

We conclude that defendant's own testimony establishes that he did not voluntarily abandon his attempt to escape, if in fact he ever intended to escape.[1] Rather, defendant's own testimony establishes that he ceased his escape attempt only when he saw that it was futile and the corrections officers were closing on his heels. As discussed above, an abandonment is not voluntary where it is made in the face of apprehension or due to a realization that the attempted crime cannot successfully proceed. Indeed, to conclude otherwise would be to hold that a criminal who is caught in the act of committing a crime can avoid criminal punishment merely by ceasing the criminal attempt and surrendering to the authorities. Such a holding would not be consistent with the law concerning the abandonment defense.

For the above reasons, we conclude that defendant was not entitled to a jury instruction with regard to the abandonment defense because he did not present sufficient evidence to support his burden of proving by a preponderance of the evidence that he abandoned his criminal attempt. Accordingly, we conclude that the trial court did not err in declining to give the requested instruction.

Affirmed.

---

[1] We must, of course, accept on appeal the fact that defendant did intend to escape because the jury did convict him of this offense and defendant does not challenge on appeal that the jury's verdict was against the great weight of the evidence.