PEOPLE v CAULLEY

Docket No. 129176. Submitted July 14, 1992, at Lansing. Decided
    December 7, 1992, at 9:05 A.M. Leave to appeal denied, 442
    Mich —.
John F. Caulley, III, was convicted by a jury in the Oakland
    Circuit Court, Edward Sosnick, J., of second-degree murder and
    possession of a firearm during the commission of a felony. The
    defendant contended that he was either insane or acting with
    diminished capacity at the time of the shooting as a result of
    his use of a prescription sleeping medication, Halcion. The
    court refused a prosecution request for an instruction concern-
    ing voluntary intoxication, finding that instruction not applica-
    ble, although it had in its preliminary instructions told the jury
    that a person is not legally insane just because of voluntary
    intoxication by alcohol or drugs at the time of a crime. The
    court also denied a defense request for an instruction that the
    jury could consider the effects of Halcion on the defendant's
    mental condition when considering the defenses of insanity and
    diminished capacity and whether the prosecution had proven
    the necessary specific intent. The defendant appealed.
    The Court of Appeals held:
    1. It was error requiring reversal for the trial court to refuse
    to instruct the jury concerning the defendant's theory that the
    defenses of insanity and diminished capacity arose out of
    involuntary intoxication resulting from his use of a prescrip-
    tion drug. There was a particular need for the instruction in
    view of the preliminary instruction that voluntary intoxication
    cannot form the basis for the insanity defense. In the absence
    of guidance from the court, the jury may have treated the use
    of Halcion as voluntary intoxication. On retrial, the court must
    instruct the jury that if it determines that the defendant
    became intoxicated as a result of the use of Halcion without
    knowledge of its side effects, it may consider whether that
    involuntary intoxication caused the defendant to be mentally

REFERENCES

Am Jur 2d, Criminal Law § 156; Trial § 1279.
When intoxication deemed involuntary so as to constitute a defense
    to criminal charge. 73 ALR3d 195.

ill or legally insane at the time of the shooting. The court also should clarify that any involuntary intoxication from Halcion may be considered in determining whether the defendant acted with diminished capacity.

2. It was not error to permit the prosecution to call a witness who was not on the witness list to rebut the insanity defense; however, on retrial, all such witnesses must be listed as required by statute.

3. It was error to permit the prosecution's experts to testify concerning the legal definition of insanity. On retrial, those experts may testify concerning the defendant's insanity using hypothetical questions that incorporate the legal definition of insanity that it is assumed will be used by the court in its charge to the jury.

4. The defendant failed to show any unfair prejudice resulting from the use of hearsay by the prosecution's experts.

Reversed and remanded.

CRIMINAL LAW — INSANITY — INVOLUNTARY INTOXICATION — PRESCRIPTION DRUGS.

A defendant who claims and factually supports that insanity or diminished capacity resulted from the use of a prescription drug without knowledge that its side effects include exacerbation of any preexisting mental illness is entitled to a jury instruction clarifying the distinction between the legal effect of involuntary intoxication and voluntary intoxication; the jury should be instructed that if it determines that the defendant became intoxicated from the use of the prescription drug without knowledge of its side effects, it may consider whether that involuntary intoxication caused the defendant to become insane or act with diminished capacity.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Richard Thompson,* Prosecuting Attorney, *Michael J. Modelski,* Chief, Appellate Division, and *Robert C. Williams,* Assistant Prosecuting Attorney, for the people.

*Lizza and Mulcahy, P.C.* (by *David M. Lawson*), for the defendant on appeal.

Before: SAWYER, P.J., and CONNOR and A. G. BEST, II,* JJ.

CONNOR, J. Defendant was convicted by a jury of one count each of first-degree murder, MCL 750.316; MSA 28.548, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). On April 12, 1990, defendant received the mandatory sentences of life without possibility of parole, and two years, respectively. Defendant appeals as of right. We reverse and remand for a new trial.

I

Defendant shot and killed his wife at an intersection near the marital residence on September 12, 1988, at approximately 6:50 A.M. Defendant had ridden a bicycle to the intersection at about 6 A.M. and waited for his wife to pass by on her way to work. Defendant attempted to secrete himself behind a tree, but persons in the area could readily see defendant, and one neighbor even recognized him although he had his face covered with a nylon stocking. Defendant was still clad in the same dirty and disheveled shirt and shorts he had been observed wearing every day for about a week preceding the shooting.

After the shooting, defendant rode off on his bike and returned to the marital residence. Apparently the gun was buried, and never found. Other potentially incriminating items were also discarded by defendant, including the nylon stocking and a pair of gloves. Defendant washed his clothing and was preparing to go to work when the police arrived and apprehended him. Kathleen

* Recorder's Court judge, sitting on the Court of Appeals by assignment.

Caulley suffered three gunshot wounds and died fifteen days later as a result of those wounds.

At trial, while defendant did not contest the fact that he shot his wife, he did contend that he was either insane or acting with a diminished capacity and, therefore, unable to form the specific intent necessary for first-degree murder. Central to defendant's case was his mental state and the effect the use of the sleeping medication, Halcion, had on his mental condition at the time of the shooting.

Defendant presented evidence at trial that his mother suffered from paranoid schizophrenia and that he was often the object of her abuse while growing up. As problems between defendant and his wife began to escalate about 1987, many of the same themes that caused pain for defendant in his childhood as a result of his mother's behavior began to resurface in conflicts with his wife. The relationship became increasingly abrasive, and defendant's mental instability escalated accordingly. He began to suffer a mood and thought disorder marked by cyclical periods of acting out his emotions. On a periodic basis, defendant would lose contact with reality, and, in general, he suffered a stormy emotional life.

Dr. Kenneth Adams, a psychologist who evaluated defendant for purposes of trial, diagnosed his condition as a schizophrenia-type disorder, which would be consistent with a diagnosis of manic-depression. Defendant's changing behavior around the time of the shooting was thought to be indicative that he was suffering from a mental illness. Dr. Adams also opined that at the time of the shooting defendant was acting in a psychotic fashion and there was a high probability that he had a substantial thought or mood disorder that impaired his judgment or behavior. One event in particular, which occurred on the Saturday before

the shooting, suggested to Dr. Adams that defendant was suffering a significant thought disorder. After an argument with his wife in which she told him that he would never be close to his children, defendant said to himself that his wife was a dead woman, rationalizing that her death was justified if it meant avoiding separation from his children. Upon rationalizing his wife's demise, defendant then planned her death. He took a gun from his brother's house without his brother's knowledge and concocted the plan to kill his wife, which included hiding behind a tree near the intersection that she passed on her way to work.

Defendant's other expert witness, Dr. Douglas Sargent, a psychiatrist, opined that at the time of the shooting defendant had reached a point where he was psychotic and could not control his actions by the exercise of either judgment or reason. Dr. Sargent concluded that defendant probably suffered for many years from cyclothymic disorder, and eventually defendant's condition evolved into the more serious bipolar mood disorder, which, in turn, can reach psychotic proportions in cyclical changes. Dr. Sargent testified concerning numerous factors and events that contributed to defendant's mental deterioration, the most significant being the exacerbation of defendant's prior mental illness by his ingestion of Halcion at a rate of three to five tablets a day for about a week before the shooting.

Before the shooting, defendant was being treated for depression and also for a stress reaction condition that caused him to pull his hair out. He was being treated with the antidepressant, Elavil, and a tranquilizer, Xanax. Defendant did not appear to respond to this course of treatment, and his problems escalated dramatically with hospitalizations and suicide attempts during the summer of 1988.

Defendant's inability to cope with the stresses in his life suggested the need for psychiatric intervention. However, in August 1988, defendant's treating psychiatrist notified him that he no longer could treat defendant, because he believed defendant was not cooperating with the recommended course of treatment. Defendant attempted to engage another professional for treatment, but was unable to make an appointment until September 12, 1988, the date of the shooting.

During one of his hospitalizations, defendant had severe insomnia, which is a common symptom of the manic phase of manic-depression. He was prescribed Halcion, a sleeping aid, in a dosage of 0.25 milligrams to be taken at bedtime. When defendant left the hospital, he was given a prescription for Halcion and also a prescription for one refill. The first prescription was apparently filled and used, because the prescription was refilled on September 7, 1988, for thirty tablets.

Immediately preceding the shooting, defendant was no longer taking his other prescription medications, Xanax and Tegretol, which caused a rebound insomnia and intensified his sleep disturbance. Dr. Sargent opined that defendant was desperate for sleep at this time. According to statements made by defendant, he thought he was taking three to five Halcion tablets a day, although the prescription designated daily dosages of one or two tablets. One of the side effects of Halcion is that it causes memory loss, consequently defendant was not sure about the dosage level when recounting the events to Dr. Sargent. At trial, however, defendant presented the testimony of his father, who, after the shooting, had found the vial of Halcion that had been filled on September 7, 1988, with only a few tablets in it. Dr. Sargent used this testimony to calculate that

in the week preceding the shooting, defendant was taking about three to five tablets a day of Halcion, an amount considered to be toxic.

Dr. Sargent testified that studies in this country, as well as in Holland and the United Kingdom, have linked the use of Halcion to psychotic behavior. The doctor explained that Halcion acts as a releasing agent in the mentally ill by facilitating the emergence of impulses that are ordinarily held in control, resulting in disorganized behavior for those taking the medication in far smaller doses than defendant was ingesting before the shooting.

It was Dr. Sargent's opinion that defendant's mental condition fluctuated, depending upon how much support he had. When in the hospital, under medication, and away from the stress in his life, his condition improved. When he was discharged and returned to the environment that caused his stress, his mental stability diminished. Dr. Sargent's opinion was that defendant was psychotic at the time of the shooting. He cited the crime itself as a major symptom of the mental disorder. Defendant's involvement was meant to be hidden, but a child could have done a better job, and, in his deranged and irrational state, he thought the shooting was a reasonable way to prevent his wife from separating him from his children. His actions indicated a gross distortion of reason or reasoning power, and, after the shooting, he thought it was merely a dream and had not really happened. Later, Dr. Sargent thought that the psychotic behavior had disappeared after defendant received some treatment.

The prosecution, in rebuttal, presented expert testimony that defendant merely had a character or personality disorder that did not rise to the level of a thought or mood disorder that would prevent defendant from controlling his actions. In

addition, the prosecution also contended that defendant's use of Halcion was voluntary, not unlike the use of alcohol or cocaine.

II

Defendant's initial issue on appeal concerns the trial court's refusal to read supplemental jury instructions requested by defendant concerning the effects of Halcion and a modified instruction on diminished capacity. In addition, defendant claims error with regard to the court's instructions on both first-degree and second-degree murder.

In reviewing issues related to jury instructions, this Court reviews the instructions in their entirety to determine if error requiring reversal occurred. Instructions may not be extracted piecemeal to establish error. *People v Harris,* 190 Mich App 652, 664; 476 NW2d 767 (1991), lv den 439 Mich 996 (1992). The instructions must include all elements of the charged offense and must not exclude material issues, defenses, and theories if there is evidence to support them. *Id.* Even if the instructions are somewhat imperfect, there is no error if they fairly presented to the jury the issues to be tried and sufficiently protected the rights of the defendant. *Id.* However, where there is evidence to support a defense instruction, the trial court is obliged to so instruct. *People v Cross,* 187 Mich App 204, 206; 466 NW2d 368 (1991). It also is error if the trial court instructs on the prosecution's theory, but not on the defense's theory. *People v Jones,* 395 Mich 379, 393; 236 NW2d 461 (1975).

A

Defendant first contends that the trial court

erred in refusing to give a supplemental instruction that would have informed the jury that it could consider the effect Halcion had on defendant's mental condition when considering the insanity defense, defendant's diminished capacity, and also whether the prosecutor established the specific intent necessary for first-degree murder.[1]

Defendant argues that the supplemental instruction was necessary, because in its preliminary instructions the trial court had instructed the jury that while insanity is a defense to the crime of first-degree murder, a person could not be legally insane just because he was voluntarily intoxicated by drugs or alcohol, basing the instruction on CJI2d 7.10 and MCL 768.29a(1); MSA 28.1052(1) (1).[2] Defense counsel objected to this instruction,

---

[1] Defendant requested that the court give the following instruction:

> There has been testimony in this case that the Defendant, John Caulley, took a greater than normal dosage of Halcion sleeping pills on the night and early morning of September 11, 1988, as well as on the previous four nights. An expert witness, Dr. Douglas Sargent, has testified that the use of Halcion in even normal dosages has been shown at times to have had the effect on persons who are already mentally ill of disorganizing and debilitating their mental illness even further. As jurors, you may accept or reject or give whatever weight you decide to Dr. Sargent's testimony in that regard. If you accept his testimony, you may consider the effects of the heavy dosage of Halcion upon Mr. Caulley's mental condition such that it could contribute to or complicate an existing mental illness, or could cause mental illness as I have defined that to you, and/or could cause legal insanity as I have defined that to you, and/or could cause diminished responsibility, meaning, in this case, a lack of sufficient mental capacity to deliberate as I have defined deliberation for you, and/or could cause Defendant to have [sic] lack of criminal responsibility for first degree murder as I have defined the elements of that offense for you.

[2] The trial court's preliminary instruction to the jury was, in part, as follows:

> To be legally insane, a person must first be mentally ill, as I have defined those conditions. But that is not enough. To be legally insane, the person must, because of his mental illness, lack substantial capacity either to appreciate the wrongfulness

reasoning that it was intended to address recreational drug use and, in this case, defendant was prescribed Halcion as a treatment.

At the conclusion of proofs, the prosecutor again requested that the trial court instruct on voluntary intoxication in its final charge to the jury. However, after hearing the testimony, the trial court agreed with defendant that the voluntary intoxication instruction was not applicable. Nevertheless, the trial court also refused to give defendant's requested supplemental instruction.

We believe defendant's proposed instruction was necessary in light of the facts and evidence offered in this case. Defendant's theory regarding the effects of Halcion on his mental condition, and the expert testimony which supported the theory, made it imperative that the court provide the jury with sufficient guidance to be able to evaluate the testimony in the context of the insanity defense. The trial court declined to read the instruction, finding that it was argumentative and that the other instructions were adequate to inform the jury of defendant's theory. We believe the instructions concerning defendant's theory did not adequately present the theory to the jury, therefore we find this error requires reversal.

This Court recently distinguished between a defense based upon involuntary intoxication caused by drugs and a defense based upon voluntary intoxication. In *People v Wilkins,* 184 Mich App 443, 449; 459 NW2d 57 (1990), lv den 439

of his conduct or to conform his conduct to the requirements of the law he is charged with violating. A person is not legally insane just because he was voluntarily intoxicated by alcohol or drugs at the time of the crime. Of course, a mentally ill person can also be intoxicated and both conditions may influence what he does. You should decide whether the defendant was mentally ill at the time of the crime. If he was, you should use the definitions I gave you to decide whether he was legally insane.

Mich 866 (1991), the panel held that the defense of involuntary intoxication is part of the defense of insanity when the chemical effects of drugs or alcohol render the defendant temporarily insane. As in any case in which the defendant interposes an insanity defense, it remains incumbent upon the defendant to demonstrate that the involuntary use of drugs created a state of mind equivalent to insanity. *Id.* at 448-449. In contrast, an individual who is voluntarily intoxicated does not have grounds for an absolute defense based upon his insanity. See CJI2d 7.10; MCL 768.29a(1); MSA 28.1052(1)(1).[3]

Intoxication has been defined as a "disturbance of mental or physical capacities resulting from the introduction of any substance into the body." *People v Low,* 732 P2d 622, 627 (Colo, 1987).

> Voluntary or self-induced intoxication is "caused by substances which the defendant knows or ought to know have the tendency to cause intoxication and which he knowingly introduced or allowed to be introduced into his body . . . .'" Involuntary intoxication is intoxication that is not self-induced and by definition occurs when the defendant does not knowingly ingest an intoxicating substance, or ingests a substance not known to be an intoxicant." [*Id.* Citations omitted.]

The characterization of intoxication as either voluntary or involuntary depends upon the facts of each case. *Id.*

---

[3] The one exception to this is if the voluntary continued use of mind-altering substances results in a settled condition of insanity before, during, and after the alleged offense. *People v Conrad,* 148 Mich App 433, 438-441; 385 NW2d 277 (1986), lv den 424 Mich 908 (1986). This exception does not appear to fit the facts of this case, because the evidence offered by defendant was that his underlying mental condition was affected by more recent use of prescription drugs in excessive quantities, causing unforeseen side effects, including the escalation of his mental illness to a psychotic state.

Other jurisdictions have recognized that involuntary intoxication can be caused by the use of prescription medications. Such intoxication can constitute a complete defense if the defendant was unexpectedly intoxicated because of the ingestion of a medically prescribed drug. *Minneapolis v Altimus,* 306 Minn 462, 469-470; 238 NW2d 851 (1976). In order to establish the intoxication is not voluntary, the defendant must not know or have reason to know that the prescribed drug is likely to have the intoxicating effect. *Id.* at 470. Second, the prescribed drug, not another intoxicant, must have caused the defendant's intoxicated condition. *Id.* Third, the defendant must establish that as a result of the intoxicated condition, he was rendered temporarily insane. *Id.* Consequently, it is necessary to assess the effect of intoxication in conjunction with Michigan's test for insanity. See also *People v Turner,* 680 P2d 1290, 1292-1293 (Colo App, 1983) (discussion of effects of overdose of prescribed medication on whether the resulting intoxication was voluntary or involuntary). It was defendant's theory that he was rendered temporarily insane as a result of an involuntary intoxication caused by his use of prescription medication. Defendant presented sufficient evidence of his ingestion of Halcion in the period preceding the shooting, as well as expert testimony about its deleterious effects, to mandate the giving of instructions regarding this affirmative defense. Compare *Garza v State,* 829 SW2d 291 (Tex App, 1992) (failure to instruct on involuntary intoxication caused by Prozac was not error where there was no evidence that the defendant consumed Prozac and that he was in the one percent of the population for which Prozac is believed to cause violent behavior). Compare also *Blaylock v State,* 600 So 2d 1250, 1251 (Fla App, 1992).

The trial court's failure to provide the jury with a legal standard for assessing defendant's sanity in the context of the influence the use of Halcion may have had was exacerbated by the court's flawed preliminary instructions concerning voluntary intoxication and, effectively, may have prevented the jury from applying defendant's theory to the facts. The trial court's only instructions on how to evaluate the evidence of defendant's Halcion-induced intoxication were the preliminary instructions that a person is not legally insane just because of voluntary intoxication. Without a clarifying instruction that distinguished involuntary and voluntary intoxication, the jury might have presumed that if it found defendant's mental condition was caused in part by a Halcion-induced intoxication it could not find that he was legally insane. Without some dichotomy being drawn between voluntary and involuntary intoxication, defendant's theory that his use of Halcion caused his insanity at the time of the shooting could have been used to convict him of the crime. In the absence of any guidance from the trial court, it is reasonable to assume that the jury simply treated the ingestion of Halcion as voluntary, without regard to unforeseen results or side effects experienced by defendant.

Therefore, we find that the failure to fully instruct the jury with regard to defendant's theory requires a new trial. Upon retrial, the trial court must instruct the jury that if it determines that defendant was involuntarily intoxicated as a result of ingesting a prescription drug, Halcion, without knowledge of its side effects, the jury can then assess whether because of this involuntary intoxication defendant lacked the capacity to conform his conduct to the requirements of the law. The court should formulate instructions that will clar-

ify that it is for the jury to decide, on the basis of the evidence, whether defendant was intoxicated, whether the intoxication was voluntary or involuntary, and what effect, if any, the intoxication had on defendant's mental condition. If the jury finds that defendant was involuntarily intoxicated, then it may consider whether that could cause mental illness or legal insanity, as the court will define those terms.[4]

B

Defendant also claims that the trial court erred in not reading a supplemental instruction to the jury that would have clarified the distinctions between his primary theory of insanity and his alternative theory of diminished capacity. Defendant argues on appeal that he wanted it made clear to the jury that even if it found he was voluntarily intoxicated as a result of the use of Halcion, it could still use that evidence to decide that he lacked the mental capacity to form the specific intent necessary for first-degree murder.[5]

The only objection made on the record was for the trial court's failure to modify the instruction concerning diminished capacity. CJI2d 6.3. We find no error with the instruction given. However, because defendant claims that he acted with diminished capacity as part of his insanity defense,

---

[4] We have not set forth specific instructions the trial court must provide in this case, because the instructions must be tailored to the actual evidence in the second trial. Because this is a relatively new area in Michigan law, for which there are no standard jury instructions, we admonish the trial court and the parties to exercise great care in the preparation of jury instructions that fit the evidence and theories of both sides.

[5] Specifically, Dr. Sargent testified that one of the features of defendant's mental condition, bipolar disorder, was that defendant lacked the capacity to deliberate; defendant was unable to control his impulses by acting only upon reflection.

it should be clarified upon retrial that the jury may also consider any involuntary effects from the use of Halcion on defendant's mental condition in deciding whether he acted with diminished capacity.

C

Defendant also claims error in the trial court's instruction that stated, in essence, that if the jury did not find the intent for second-degree murder was established, it could not find defendant guilty of either first-degree or second-degree murder. We believe this instruction was not erroneous when viewed in context because the trial court had adequately set forth the differences in the requisite intent for each crime. *People v Dykhouse,* 418 Mich 488, 502; 345 NW2d 150 (1984). The instruction to which defendant objected did not contradict the instructions concerning the elements of the crimes, and, while it should not be repeated upon retrial, it does not alone constitute error requiring reversal.

III

Next, defendant argues that the trial court erred in allowing Michael Sartor to testify at trial as a rebuttal witness for the prosecution, even though he had not been listed as a witness on the prosecution's notice of rebuttal to the insanity defense and had been allowed to sit through the trial in violation of the order sequestering witnesses. The prosecutor conceded he did not comply with MCL 768.20a(7); MSA 28.1043(1)(7), in failing to list Sartor as a witness in rebuttal to the insanity defense. According to the prosecutor, once he learned, on the basis of the evidence offered by the

defense, that Sartor should be called as a rebuttal witness, Sartor was sequestered for the remainder of the trial. Defense counsel accepted the prosecutor's statement regarding this point.

As a remedy, the trial court allowed defense counsel an opportunity to talk with Sartor to learn what his testimony would consist of and to determine whether he appeared to be influenced by hearing the other witnesses testify. After talking with Sartor, defense counsel was unable to specify any prejudice that resulted from Sartor being in the courtroom, but nonetheless continued his objection. The trial court determined that the testimony was probative and allowed Sartor to testify because he was sequestered once it was clear he would be called as a witness.

We believe Sartor was an appropriate rebuttal witness to the insanity defense, because that defense was largely premised upon circumstantial evidence that defendant had ingested a large amount of Halcion in the days immediately preceding the shooting, which first was discovered when a nearly empty vial of Halcion was found by defendant's father months after the shooting. Sartor's testimony was offered to prove that, in fact, not as many Halcion tablets were taken by defendant as claimed by defendant's witnesses. This clearly was relevant testimony to rebut the insanity defense, and the relevancy was not revealed until the time of trial. *People v Kelly,* 423 Mich 261, 281; 378 NW2d 365 (1985); *People v Leo,* 188 Mich App 417, 422; 470 NW2d 423 (1991), lv den 439 Mich 897 (1991). Upon retrial, the prosecutor shall list all witnesses to be called to rebut the insanity defense, as provided in MCL 768.20a(7); MSA 28.1043(1)(7).

IV

Defendant's third issue involves purported er-

rors in the testimony of the prosecution's expert witnesses, Dr. Patricia Watson and Dr. Carol Holden.

A.

Defendant first contends that both of the prosecutor's experts were improperly allowed to testify extensively about what the law requires for one to be found insane. Defendant contends that these experts were allowed to offer their personal opinions about what the Legislature intended to constitute legal insanity.

The law in this area was recently analyzed in *People v Anderson,* 166 Mich App 455, 464; 421 NW2d 200 (1988), lv den 432 Mich 858 (1989):

> Expert testimony in the form of an opinion is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. MRE 704. Thus, a psychiatrist or psychologist may testify that a defendant was or was not insane when he performed the act in question. However, an expert's opinion as to the law of criminal responsibility or insanity is of no aid to the jury, and could possibly confuse them. *People v Doan,* 141 Mich App 209, 214; 366 NW2d 593 (1985), lv den 422 Mich 945 (1985); *People v Drossart,* 99 Mich App 66, 76; 297 NW2d 863 (1980), lv den 410 Mich 892 (1981). Based upon the fine distinction made by these two cases, it is clear that an expert may testify regarding the accused's ability to conform his conduct to the demands of the law, and may even testify that, in his opinion, the defendant was mentally ill or insane. However, an expert witness may not provide a definition of these legal terms for the jury.

The prohibition upon experts offering legal defini-

tions of what constitutes insanity is clear. In this case, the prosecutor erred in questioning his experts about what the law requires for insanity. This allowed the expert witnesses to provide legal definitions to the jury, which invaded the trial court's role, and, as stated in *Anderson, supra,* may have served to confuse the jury.

Upon retrial, the prosecutor should be limited to the use of hypothetical questions that incorporate the legal definitions of insanity that it is assumed the trial court will provide when instructing the jury with regard to what the law requires for one to be found insane. Open-ended questioning of the experts about what is the legal definition of insanity should be avoided. This procedure will allow the prosecution's experts to testify with regard to their respective opinions concerning defendant's legal insanity, and should avoid confusion for the jury with regard to what the law requires for the insanity defense. See also *People v Matulonis,* 115 Mich App 263, 268; 320 NW2d 238 (1982), lv den 413 Mich 908 (1982).

B

Defendant also argues that it was error for Dr. Watson to inject hearsay evidence into her testimony at trial. The objectionable evidence involved references to the victim's diary that recounted past incidents of physical abuse by defendant and his brother and also medical reports, including opinions, of other psychologists concerning defendant's mental health. In addition, defendant argues that this error was compounded when the prosecutor treated this testimony as substantive evidence in closing arguments.

MRE 703 provides that an expert witness may base an opinion on hearsay evidence. Under MRE

705, an expert may be required to disclose the underlying facts or data on cross-examination. In *People v Anderson, supra* at 465-466, the Court held that because MRE 703 now allows an expert to rely upon hearsay evidence, it was not error for the prosecution's experts to rely upon the reports and opinions of the other testifying experts in the case. In fact, if requested to do so, an expert may be required, upon cross-examination, to disclose the underlying facts and data. More recently, our Supreme Court has clarified that the policy behind MRE 703 is to allow into evidence all probative facts underlying an expert's opinion, including the opinions of other experts. *People v Dobben,* 440 Mich 679, 695-697; 488 NW2d 726 (1992). It was therefore defense counsel's duty either to not inquire into this area himself or to move to exclude this evidence because of the danger of unfair prejudice. *People v Peach,* 174 Mich App 419, 432; 437 NW2d 9 (1989), lv den 433 Mich 902 (1989). Without an objection based upon unfair prejudice, MRE 403, we decline to disturb the trial court's ruling concerning this evidence.

In a similar vein, defendant also objects to Dr. Watson's references to the victim's diary. Dr. Watson explained that she referred to the victim's diary as a means of contrasting defendant's statement to her about the couple's marriage. Initially, defense counsel did not object to this line of evidence. After there had been some references to physical abuse of the victim by defendant, in locking her out of the house and her being assaulted by defendant's brother, defense counsel did object on relevance grounds, and the prosecutor moved on to other areas. Because this evidence was part of the underlying support for Dr. Watson's opinion testimony, we do not find an abuse of discretion. *People v Rockwell,* 188 Mich App 405,

410; 470 NW2d 673 (1991), lv den 439 Mich 978 (1992); *Peach, supra.*

C

Defendant also claims that the court erred in allowing Dr. Watson, who was the assistant director of the Center for Forensic Psychiatry, to testify concerning defendant's relative position within the range of patients and mental illnesses Dr. Watson sees at the Forensic Center. Defendant objected on the grounds of relevance.

On the limited record and objection made concerning this evidence, we agree that the trial court did not abuse its discretion in ruling the evidence was relevant. *Rockwell, supra.* If defendant believes that he will be unfairly prejudiced by this testimony upon retrial, he may request by a motion in limine that the trial court determine the relevance or unfair prejudice. MRE 403.

V

Defendant also contends that the prosecutor's closing argument amounted to misconduct, thereby depriving him of his right to a fair trial. Because there were no objections to the prosecutor's argument and we are reversing on other grounds, we have not addressed the merits of this issue. *People v Ray,* 191 Mich App 706, 709; 479 NW2d 1 (1991).

Reversed and remanded for a new trial. We do not retain jurisdiction.