*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

CORTECO CORTEZ LEFLORE,

        Defendant-Appellant.

UNPUBLISHED
February 10, 2025
9:20 AM

No. 367756
Wayne Circuit Court
LC No. 22-001357-01-FC

Before: BOONSTRA, P.J., and K. F. KELLY and YOUNG, JJ.

PER CURIAM.

Defendant, Corteco Cortez Leflore, appeals as of right his jury-trial convictions of second degree murder and related gun offenses for the fatal shooting of his partner, Shawna Hicks (Hicks). Leflore was sentenced as a fourth offense habitual offender, MCL 769.12(1)(a), to 40 to 100 years' in prison.[1]  On appeal, Leflore argues that his defense counsel was ineffective, he is entitled to resentencing, and the verdict was against the great weight of the evidence.  We affirm his convictions and sentence.

## I. FACTUAL AND PROCEDURAL HISTORY

Leflore and Hicks were romantically involved and shared two young children.  Leflore had a history of health issues, including problems with his heart; he had suffered a mild stroke for which he was prescribed medication.  He was also a diabetic and was prescribed Metformin. Leflore testified that in general, he was on "about six medications[]" which he took inconsistently. In November 2021, Leflore contracted COVID-19 (COVID) and was hospitalized for twelve days. He was released on December 9, 2021.  After being released, he was instructed to continue to take

---

[1] This will run consecutively to his two-year sentence for possession of a firearm by a person convicted of a felony (felon-in-possession), MCL 750.224f.  Leflore was also convicted of two counts of carrying a firearm during the commission of a felony (felony-firearm), MCL 750.227b, for which he received one to five years' imprisonment to run concurrently with his second-degree murder sentence.

his medication and receive supplemental oxygen. Leflore noted he was on "[a]bout eleven[]" medications following COVID. Leflore testified that the medications interfered with his cognitive abilities. "I believe I mentioned to one of the Nurses that, like, my head was, like, feelin' [sic] funny." Leflore explained, "I didn't feel like I was myself." He claimed he noticed a "personality change" because of "the medication."

On December 27, 2021, Leflore learned Hicks was having a sexual relationship with someone else. Leflore did not sleep that night, but testified that he took all his prescribed medications. The next day, on December 28, 2021, Leflore asked Hicks to leave the house. He went to the liquor store and purchased alcohol. Leflore testified he was not told to avoid alcohol while taking medications he was prescribed after contracting COVID, and that he "always [had] been able to handle [his] liquor." When he returned home, he saw Hicks leaving with the children. Leflore spent the day smoking and drinking. At one point later in the evening, Hicks returned home with the children. Leflore, who had been sitting in the kitchen drinking, fired his Sig Sauer firearm at Hicks, killing her. The children were not in the same room as Hicks when Leflore shot her, but they heard and saw everything that transpired thereafter. At the scene, Leflore told police that he "snapped." Later at trial, he testified that "everything went blank," that he "blacked out" and did not remember pulling the trigger.

Leflore testified he heard the children crying loudly, and warned them to stay in a different room. He called 911. When responding officers arrived at the scene, they observed the children surrounding Hicks' body trying to wake her up as blood pooled around her. Officers testified the children then hid under the bed in one of the bedrooms because they were "scared, terrified," and were crying loudly and in an "inconsolable state." The children were "[a]fraid to come from the back bedroom, outright refusing, and screaming" when approached by officers. Leflore was arrested at the scene and charged with first-degree, premeditated murder, felon-in-possession, and two counts of felony-firearm. The jury convicted Leflore of second-degree murder, felon-in-possession, and two counts of felony-firearm. Leflore was sentenced as discussed above. This appeal followed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Leflore argues defense counsel was ineffective for failing to provide proper notice of the affirmative defense of involuntary intoxication. We disagree.

## A. STANDARD OF REVIEW

"A defendant's ineffective assistance of counsel claim is a mixed question of fact and constitutional law." *People v Shaw*, 315 Mich App 668, 671; 892 NW2d 15 (2016) (quotation marks and citation omitted). "When reviewing an ineffective assistance of counsel claim, this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of law." *Id*. at 671-672. "The trial court's findings are clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake." *Id*. at 672.

## B. ANALYSIS

As a preliminary matter, Leflore's appellate brief lacks citation to any legal authority in support of this argument that his trial counsel was ineffective. He fails to make any reference to

relevant caselaw or statutes, except for when providing this Court with the standard of review for an ineffective assistance claim, and the test for establishing that trial counsel was ineffective. Leflore failed to adequately brief this issue, and merely announced the position that the outcome of his trial would have been different had he been given effective assistance. See *People v Kevorkian*, 248 Mich App 373, 388; 639 NW2d 291 (2001) (citation omitted) ("It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position."). "[A]n appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue." *People v Harris*, 261 Mich App 44, 50; 680 NW2d 17 (2004). Because Leflore failed to support his arguments with any legal reasoning, he has abandoned this argument and we need not consider it.

"However, even if a party abandons an issue by failing to support it with sufficient authority, a reviewing court may nevertheless consider the issue." *Bitterman v Village of Oakley*, 309 Mich App 53, 66; 868 NW2d 642 (2015), citing *King v Mich State Police Dept*, 303 Mich App 162, 176; 841 NW2d 914 (2013). Based on this record, we are confident that defense counsel was not ineffective for failing to give notice of the affirmative defense of involuntary intoxication.

"Involuntary intoxication is intoxication that is not self-induced and by definition occurs when the defendant does not knowingly ingest an intoxicating substance, or ingests a substance not known to be an intoxicant." *People v Caulley*, 197 Mich App 177, 187; 494 NW2d 853 (1992) (quotation marks and citation omitted). If a defendant wishes to raise the defense of involuntary intoxication, "the defendant shall file and serve upon the court and the prosecuting attorney a notice in writing of his or her intention to assert the defense . . . not less than 30 days before the date set for the trial of the case, or at such other time as the court directs." MCL 768.20a(1). Leflore argues defense counsel was ineffective for failing to give notice of the involuntary intoxication defense 30 days before trial. While defense counsel acknowledged he failed to provide sufficient notice of the defense, we agree with the trial court that Leflore failed to prove, by a preponderance of the evidence, that his intoxication was a result of taking prescribed medications alone. Thus, the involuntary intoxication defense fails on the merits.

Leflore had taken a series of prescribed medications and voluntarily consumed alcohol. The latter falls outside of the definition of involuntary intoxication. As to the former, it is possible for prescription medications to cause symptoms that would factually support the involuntary intoxication instruction. See *Caulley*, 197 Mich App at 179-180, 187-189. In this case, Leflore took his medications the evening of December 27, 2021. At about 9:30 a.m. on December 28, 2021, Leflore "went in the house, and, uhm, I just sat there, and started havin' a drink, and was smokin' some cigarettes." He drank "about a fifth of liquor[]" throughout the day and continued to smoke and drink. The trial court observed the incident "occurred at eight thirty p.m." on December 28, 2021, "almost twenty-four hours" after he last took medication. As a result, the trial court noted "[w]e don't have him taking any drugs[]" at the time of the murder. "But what we do have him doing, is . . . drinking liquor throughout the course of the morning." Further, at his police interrogation with Lieutenant Matthew Bray, Leflore denied he was under the influence of medication.

This Court has articulated a three-part test to determine whether involuntary intoxication is a viable affirmative defense. "In order to establish the intoxication is not voluntary, the defendant [first] must not know or have reason to know that the prescribed drug is likely to have the intoxicating effect." *Caulley*, 197 Mich App at 188. Leflore was taking his medications for at least two weeks after being released from the hospital and was aware of the effects of Metformin, despite taking it inconsistently. Leflore had reason to know whether the prescribed drugs might have an intoxicating effect, especially when taken in conjunction with alcohol.

"Second, the prescribed drug, not another intoxicant, must have caused the defendant's intoxicated condition." *Id*. at 188. Leflore acknowledged *voluntarily* drinking alcohol, an intoxicant, throughout the day of the incident, beginning in morning. As the trial court noted, he last took his medication on the evening of December 27, 2021, a day before the murder. "[A]n individual who is voluntarily intoxicated does not have grounds for an absolute defense based upon his insanity." *Id*. at 187. Because alcohol is an intoxicant, Leflore failed to show the prescribed medications caused his intoxicated condition.

"Third, the defendant must establish that as a result of the intoxicated condition, he was rendered temporarily insane." *Id*. As a result, "it is necessary to assess the effect of intoxication in conjunction with Michigan's test for insanity." *Id*. Under MCL 768.21a(1), a defendant may assert the affirmative defense of legal insanity if the defendant "lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law." In other words, a defendant may raise involuntary intoxication if he or she does not know or have reason to know a prescribed drug is likely to have an intoxicating effect, ingests the drug, and as a result of that drug only, and not other drugs, temporarily lacks the capacity to appreciate the wrongfulness of his or her conduct. See *Caulley*, 197 Mich App at 188; see also MCL 768.21a(1).

Defense counsel requested Leflore be referred for a competency evaluation and an evaluation for criminal responsibility based on his mental state and prior history. The trial court ordered these evaluations. Unlike the defendant in *Caulley*, 197 Mich App at 180, who was evaluated for mood disorders and was deemed highly likely to have impaired judgment at the time he shot his partner, the prosecution noted, and Leflore did not dispute, that the competency evaluation and criminal responsibility evaluation "found that [Leflore] was criminally responsible, albeit, potentially voluntarily intoxicated. Not involuntarily intoxicated. He was found competent to stand trial." The prosecution clarified, it was "determined that he was not involuntarily intoxicated, by . . . the Forensic Center, and that was not challenged by the defense." As a result, Leflore failed to establish he was rendered temporarily insane.

The record establishes Leflore's affirmative defense of involuntary intoxication would have failed even if defense counsel had provided sufficient notice of his intent to raise the defense 30 days before trial. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). As a result, the trial court did not commit clear error, *Shaw*, 315 Mich App at 671-672, when it found defense counsel was effective. We affirm Leflore's conviction in this regard.

-4-

## III.  OFFENSE VARIABLES (OVS) 5 AND 6

Leflore argues the trial court erred when it assigned 15 points to OV 5 and 25 points to OV 6.  We disagree and affirm his sentence.

## A.  STANDARD OF REVIEW

When reviewing alleged errors in sentencing, "the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence."  *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013), superseded in part by statute as stated in *People v Rodriguez*, 327 Mich App 573, 579 n 3; 935 NW2d 51 (2019).  "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo."  *Id*. citing *People v Babcock*, 469 Mich 247, 253; 666 NW2d 231 (2003).

## B.  OV 5

Leflore first argues the trial court erred when it assigned 15 points instead of 0 points to OV 5, and that he is entitled to resentencing.  We disagree.

OV 5 is scored for "psychological injury to a member of a victim's family."  MCL 777.35(1).  Fifteen points are assigned if "[s]erious psychological injury requiring professional treatment occurred to a victim's family."  MCL 777.35(1)(a).  "In making this determination, the fact that treatment has not been sought is not conclusive."  MCL 777.35(2).  In *People v Calloway*, 500 Mich 180, 186; 895 NW2d 165 (2017) (quotation marks and citation omitted), our Supreme Court held, " 'serious' is defined as having important or dangerous possible consequences."  As a result, "in scoring OV 5, a trial court should consider the severity of the injury and the consequences that flow from it, including how the injury has manifested itself before sentencing and is likely to do so in the future, and whether professional treatment has been sought or received."  *Id*.  "However, even when professional treatment has not yet been sought or received, points are properly assessed for OV 5 when a victim's family member has suffered a serious psychological injury that may require professional treatment in the future."  *Id*.

Evidence was presented at trial that Leflore's and Hicks's two children were in the house when Leflore killed Hicks.  After shooting Hicks, Leflore testified: "And then, I heard my kids. And when I heard my kids, I turned and looked at them, and I said, stay in the, I said, stay in the room, stay in the room."  "[One child], was cryin', like, really bad."

Officer Tyke Reid entered the house, and recounted: "At that time the door was open, and I could see two children surrounding the deceased, []Hicks.  And she was lyin' on the ground." The children were "[t]rying to wake her up."  Reid explained, they were "pushin' her, sayin', mommy.  And then, at that point, that's when we entered the location, and they ran into the back room."  "They were real small children.  I want to say, between the ages of three to maybe seven." Reid described: "[O]nce the location was secure, the kids was [sic] in the back room, up under the bed, hidin'.  And we was [sic] tryin' to get the kids out, but they were scared, terrified.  Didn't want to come to us."

Officer Cortez Williams confirmed the presence of the children and difficulties encountered "trying to get them to come from the back bedroom. Uhm, the children were kind of scared, and, uhm, didn't actually want to leave the bedroom." "I heard the children crying, uhm, making loud noises. Kind of in an inconsolable state." They were "[a]fraid to come from the back bedroom, outright refusing, and screaming, once we even approached them."

Lieutenant Robert Lalone saw "two boys[]" at the scene, "one was seven, and the other was four years old . . . ." Lalone stated: "[B]oth of them were playing in a side room. As you came in the hallway, off the kitchen, there was a bedroom off to the side. And that's where I was at, with the children." One child spoke with Lalone, who noted "he just really didn't have any facial expressions." "At first he said, my mom is dead. So, I patted him on the head, said, I'm sorry, I know. And then he said, uh, my dad killed my mom. And that was it, he went right back to playing with the toys."

The trial court found, Reid's testimony "indicates that, when he went in to the location, he walked upstairs, and saw two children trying to wake up the deceased . . . . And so, they were clearly in the room." "They are awake, trying to wake her up. They are screaming. They are crying." While the trial court concluded that "psychological injury is apparent . . . " from these behaviors, real-time reactions to objectively horrific events likely will not, taken alone, support that "serious psychological injury requiring professional treatment occurred to a victim's family." MCL 777.35(1)(a). Here, though, we have more.

Hicks's mother wrote in her victim's impact statement, contained in the PSIR: "The boys are going to have emotional problems for years. How do we know they are going to get the emotional, psychological support, and therapists they need[?]" Hicks's mother also detailed that she does not get to see the children, and Leflore's actions tore the family apart. At Leflore's sentencing hearing, Hicks's sister stated, referring to the children: "You completely scarred them. . . ." "It is so hard for my mental health, that I just wish I was . . . up there, with her. I become [sic] very depressed, and suicidal, end up in a mental hospital, because of the pain you inflicted on me and my family." Hicks's other sister, who was caring for the children at the time of sentencing, stated: "You have introduced trauma, and evil, into the children and mine [sic]." A third sister stated at sentencing: "[n]ow, since [the children] don't have their mother anymore, sometimes they act out. They don't have their mother's love, and protection." She explained one of the children believes Hicks is in a hospital, while the other still calls for her.

This record "provided a reasonable basis for the [trial] court to conclude that [Hicks's] family members suffered serious psychological injury." *People v Baskerville*, 333 Mich App 276, 293; 963 NW2d 620 (2020). Indeed, "[p]oints are also properly assessed when the serious psychological injury may require professional treatment in the future, regardless of whether the victim's family member presently intends to seek treatment." *Calloway*, 500 Mich at 188. As a result, the trial court did not err when it assigned 15 points to OV 5.

## C. OV 6

Next, Leflore argues the trial court erred when it assigned 25 points to OV 6. We disagree.

MCL 777.22(1) directs the trial court to score OV 6 in cases involving "homicide, attempted homicide, conspiracy or solicitation to commit a homicide, or assault with intent to commit murder." OV 6 "is the offender's intent to kill or injure another individual." MCL 777.36(1). Twenty-five points are assigned if "[t]he offender had unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result." MCL 777.36(1)(b). Leflore argues the trial court should have assigned 10 points to OV 6. To assign 10 points it must be shown "[t]he offender had intent to injure or the killing was committed in an extreme emotional state caused by an adequate provocation and before a reasonable amount of time elapsed for the offender to calm or there was gross negligence amounting to an unreasonable disregard for life." MCL 777.36(1)(c).

Leflore was convicted of second-degree murder, triggering the required scoring of OV 6. Further, the trial court must score OV 6 "consistent with a jury verdict unless the judge has information that was not presented to the jury." MCL 777.36(2)(a). The jury, by convicting Leflore of second-degree murder, found Leflore "had an unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result." MCL 777.36(1)(b). This finding was not clearly erroneous. See *Hardy*, 494 Mich at 438.

Hicks returned home with the children, unarmed. Leflore stated "I opened the kitchen door, and I looked at her, and she was standin', like, by the window." Hicks said, "I just came to drop the kids off." Purportedly, according to Leflore, at that point, "everything went blank." Leflore, "for some reason" "looked at my hand." "And when I looked at my hand, the gun, was like, cocked back, like, stuck back. And I know, when the, when the gun do [sic] that, it's been fired." Nothing in the record supports Leflore's contention he was adequately provoked. Hicks was unarmed and stood some distance from Leflore "by the window." Leflore did not state he felt afraid and the provocation occurred a day before the murder. Hicks left the house and Leflore had the clarity of mind to go to the liquor store, purchase alcohol, and spend the next day drinking. Consequently, the facts meet the standard enumerated in MCL 777.35(1)(b) because Leflore acted with unpremeditated intent to kill or created a very high risk of bodily harm. As a result, the trial court did not err when it assigned 25 points to OV 6.

## IV. GREAT WEIGHT OF THE EVIDENCE

Lastly, Leflore argues his second-degree murder conviction was unsupported by the great weight of the evidence. We disagree.

## A. STANDARD OF REVIEW

"To preserve a great-weight claim, a party must move for a new trial in the trial court." *People v Cameron*, 291 Mich App 599, 617; 806 NW2d 371 (2011). Leflore moved for directed verdict, not a new trial, resulting in this issue being unpreserved.[2]

We review Leflore's unpreserved "great-weight argument for plain error affecting his substantial rights." *Id*. at 618. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*.

## B. ANALYSIS

Leflore argues his second-degree murder conviction was against the great weight of the evidence. "A verdict is against the great weight of the evidence and a new trial should be granted when the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." *People v Evans*, 335 Mich App 76, 87; 966 NW2d 402 (2020) (quotation marks and citation omitted). The miscarriage of justice, Leflore contends, is that the evidence supports manslaughter, not second-degree murder. This argument lacks merit.

Our Supreme Court has held, "for an act to be considered voluntary manslaughter, the defendant must kill in the heat of passion, the passion must be caused by adequate provocation, and there cannot be a lapse of time during which a reasonable person could control their passions." *People v Yeager*, 511 Mich 478, 489; 999 NW2d 490 (2023). Our Supreme Court has explained: "The word 'passion' in the context of voluntary manslaughter describes a state of mind incapable of cool reflection. A defendant acting out of a state of terror, for example, is considered to have acted in the 'heat of passion.' " *People v Townes*, 391 Mich 578, 589 n 3; 218 NW2d 136 (1974). "The provocation must be sufficient to cause the defendant to act out of passion rather than reason, but it also must be sufficient to cause a reasonable person to lose control, not just the specific defendant." *Id*. Our Supreme Court emphasized:

> Both murder and voluntary manslaughter require a death, caused by defendant, with either an intent to kill, an intent to commit great bodily harm, or an intent to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result. [*Id*. (quotation marks and citation omitted).]

"The distinguishing element is malice, which in voluntary manslaughter is negated by the presence of provocation and heat of passion." *Id*. at 489-490 (quotation marks and citation omitted).

In *Yeager*, 511 Mich at 492,

---

[2] See *People v Lemmon*, 456 Mich 625, 633-634; 576 NW2d 129 (1998), distinguishing proofs involved in a motion for directed verdict (sufficiency) from a motion for new trial (weight attributable to the prosecution's proofs).

testimony presented at trial reflected that defendant's shooting of [the victim] was the culmination of a series of events during which [the victim] physically assaulted defendant, took her car and used it to attempt to run her over, and repeatedly threatened to kill defendant and . . . the neighbor who assisted her.

Our Supreme Court held: "A jury could reasonably conclude that the combination of physical and verbal threats from [the victim] throughout this unbroken chain of events stoked defendant's passions so that she acted out of heightened emotion rather than reason in shooting [the victim]." *Id*.

In this matter, Leflore learned Hicks was unfaithful the day before the murder. He described his emotional state: "I was in a state of confusion . . . . And then, it was, uh, a very disappointed feeling." On the morning of December 28, 2021, Leflore "told her, I say, hey, I need you to do me a favor. And, uhm, I said, I need you to leave the house for the day. I said, 'cause I'm startin' to feel, you know, a little angry." Leflore's words bely his argument on appeal. "State of confusion," "a very disappointed feeling" and "a little angry" do not support his contention he acted in the heat of passion. Rather, they suggest Leflore was capable of cool reflection. After hearing about Hicks's infidelity, Leflore left the room and sat in the kitchen, where he considered the revelation by Hicks: "And I thought to myself, like, wait a minute, she's always home. When did she have a chance to have sex with anybody? So, that's what I asked her." Leflore's statements demonstrate he had the opportunity to reflect on what Hicks told him. Further, a full day elapsed between learning of Hicks's sexual relationship and the murder. As our Supreme Court has held, "there cannot be a lapse of time during which a reasonable person could control their passions." *Yeager*, 511 Mich at 489. Leflore had an opportunity to control his passions, given the significant amount of time that had lapsed, about 24 hours.

Further, Leflore's voluntary-manslaughter argument lacks merit because Hicks did not adequately provoke him. Words "do not [generally] constitute adequate provocation . . . ." *People v Pouncey*, 437 Mich 382, 391; 471 NW2d 346 (1991) (citation omitted). Our Supreme Court clarified, "words of an informative nature, rather than mere insults, have been considered adequate provocation." *Id*. Informative words are those "conveying information of a fact which constitutes a reasonable provocation when that fact is observed . . . ." 2 LeFave, Substantive Criminal Law (3d ed), § 15.2(b)(6). For example, a "sudden confession of adultery . . . or information from a third person . . . has sometimes been held to constitute a provocation . . . of the same sort as " if adultery had been directly observed. 2 LeFave, Substantive Criminal Law (3d ed), § 15.2(b)(6). Further, "a wife may be reasonably provoked into a heat of passion upon finding her husband in the act of adultery with another woman." 2 LeFave, Substantive Criminal Law (3d ed), § 15.2(b)(5). However, this reasoning does not "extend beyond the marital relationship . . . ." *People v Eagen*, 136 Mich App 524, 527; 357 NW2d 710 (1984) (citation omitted).[3] Leflore and Hicks were not married. As a result, her statements to Leflore indicating she had sexual intercourse

---

[3] Although this Court is "not strictly required to follow uncontradicted opinions from this Court decided before November 1, 1990, those opinions are nonetheless considered to be precedent and entitled to significantly greater deference than are unpublished cases." *People v Bensch*, 328 Mich App 1, 7 n 6; 935 NW2d 382 (2019) (quotation marks and citation omitted).

with others, although informative, do not constitute provocation as a matter of law. As a result, the facts do not support voluntary manslaughter.

Instead, the great weight of the evidence supports Leflore's second-degree murder conviction. Leflore noted he did not intend to harm Hicks, but could not remember retrieving the gun or shooting her. Leflore called 911 and remembered informing the operator he shot Hicks. As a result, the record clearly establishes Leflore's actions killed Hicks. The issue is whether he did so with malice. See *Lange*, 251 Mich App at 251.

As discussed, a key component of malice is intent. See *Gafken*, 510 Mich at 511. This Court has held, "because it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). One such piece of circumstantial evidence is use of a weapon. Our Supreme Court has held, "[m]alice may [] be inferred from the use of a deadly weapon." *Carines*, 460 Mich at 759.

Leflore did not dispute the gun was in his hand and he pulled the trigger multiple times, firing the gun at Hicks who was unarmed, stood at a distance from him, and did not pose a physical threat. Further, at some point before the incident, Leflore bought "a nine[-]millimeter Sig Sauer[]" firearm off the streets. After cleaning it, he left it in the kitchen "on top of the refrigerator." Leflore needed to retrieve the gun before shooting Hicks. Hicks had "twelve wounds on her body . . . caused by five separate gun shots. And she also had three abrasions that were on her body, as well." The record supports the jury's finding Leflore acted with malice when he killed Hicks. Because the great weight of the evidence supports Leflore's second-degree murder conviction, we affirm.

## V. CONCLUSION

For the reasons discussed above, we affirm Leflore's convictions and sentences.

/s/ Mark T. Boonstra
/s/ Kirsten Frank Kelly
/s/ Adrienne N. Young