*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

CHANCE RAYMOND HALLAM,

Defendant-Appellant.

UNPUBLISHED
May 23, 2025
12:01 PM

No. 364848
Livingston Circuit Court
LC No. 2022-027203-FC

Before: O'BRIEN, P.J., and K. F. KELLY and BORRELLO, JJ.

PER CURIAM.

Chance Raymond Hallam, hereinafter defendant, was convicted of two counts of first-degree premeditated murder, MCL 750.316(1)(a), following a jury trial. The trial court sentenced defendant to life without the possibility of parole for each of the convictions. Defendant now appeals by right. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

It is undisputed that defendant, who was 22 years old at the time, killed his grandparents who had raised him since he was a young child. The primary dispute at trial was whether defendant was legally insane when he killed them.

On the morning of November 19, 2021, defendant called 911 and reported that he was thinking about killing his "parents"[1] because they had "tortured [his] pets as a child." On the recording of the 911 call, which was admitted into evidence and played for the jury, defendant can be heard making screaming noises and yelling that he wants a "legal execution." Within a few minutes, defendant called 911 again, identified himself, and reported that he had just killed his grandparents. A recording of this call was also admitted into evidence and played for the jury. After stating his address, defendant said, "rabbit's foot." He then told the dispatcher that "it's gonna be okay because everyone's gonna meet up in heaven." Defendant indicated that he killed

---

[1] It is evident that defendant was actually referring to his grandparents.

-1-

them with a sword and that "they were asking for it in every single way." Defendant told the dispatcher that his grandparents were "terrible people," who tortured his pets, tried to rape him as a child, had ways to make people "forget things," and told him to buy alcohol while on probation. He again stated that he wanted "this to be a legal execution."

While defendant was still on the line with the 911 dispatcher, police officers arrived at the home where defendant lived with his grandparents, and the officers met defendant in the driveway. The interaction between defendant and the police officers was recorded by a body camera worn by one of the officers. This video was also admitted into evidence and played for the jury. Defendant continued to make bizarre statements, including that his grandparents only fed him chips when he asked for "healthy food," that they were torturing his pets, that he "had to kill them," that they had tried to rape him as a child, and that they had "ways of making you forget things." He also stated that everyone would "meet up in heaven," that everyone would "be okay in the end," and that God loved everyone but had to punish the bad people. Defendant stated that he was not God but that he believed he was an "angel." Defendant indicated that he used a sword and two knives to kill the victims.

In defendant's bedroom, police discovered "marijuana wax containers," "whippit containers," open alcohol bottles, and a "package of salvia." There was testimony explaining that a whippit container is a nitrous oxide canister, which is usually used for BB guns or making whipped cream but can also be a means for abusing nitrous oxide. Approximately 300 to 400 empty whippit canisters were found in defendant's bedroom, along with additional unused canisters.

Detective Trooper Angela Hunt of the Michigan State Police testified that she interviewed defendant on November 19, 2021. A video of the interview was admitted and played for the jury. During the interview, defendant reiterated his previous claims that his grandparents tortured his pets, only fed him chips, and had raped him. Defendant told Hunt that he had thought about killing his grandparents the previous day while he was eating breakfast and then "woke up today remembering what happened to my cat." He then described how he had called 911, and he explained his thought process:

> And, I asked the person on the phone, I said, I started screaming, I said I want a legal execution. I said, I want to kill them. I cannot kill them. And, I heard a five to ten second pause, which like made me think about it even more, and even more. And, then, I heard someone say, no, with a question mark. And, I was like, no, I am killing them. Now, there is no way that I can't. There's no way that someone that's about to kill someone isn't going to do it after they called for police. And, it's almost like God, that was one of God's angels that just knew what to say, knew exactly what to say. And, that, whoever was on that 911 call, just know they are innocent, they are a hundred percent innocent. And, even if they weren't supposed to do that, the reason they could have had that long pause was because of what they just heard. And, they were just trying to figure out what the heck did they just hear. And, the way they said, no, I just had to do—I heard, no, with a question mark.

\* \* \*

But they could have said, no, like that, just by what they've heard, and like (indiscernible)—like that feeling when you get surprised and like you just have to talk and say something. And, I'm just saying, the way I heard it, it's—I—there was no possible way that I could have stopped myself at all.

Defendant next described how he had killed his grandparents. He stated, "when this happened, I told them that they would go to heaven." He also stated, "But, everyone -- if you ask me, I think everyone should go to heaven, but the bad ones should just be punished before they go." Defendant said, "All I wanted to do was execute them."

Defendant made further bizarre statements throughout the interview. For example, he claimed that he "had superpowers in the past," that he had seen angels, that he "literally had talked to aliens," that he had "hugged the aliens," and that aliens had teleported into his room when he was a child. He also claimed that there was "a giant spaceship in space that tortures people relentlessly, but only if you're bad," and that he had created the spaceship. Defendant explained that this spaceship had robots and drones that were "watching us right now" and that "every single person has a drone." He stated, "I think I have a license to kill too, I am not sure if I still have that." Defendant also asked Hunt, "Was my grandma an alien who got picked up by aliens?"

Defendant admitted that he generally smoked "[a] lot" of marijuana. He drank alcohol the previous day. Defendant also stated that the previous night, he used either a whole or half "pack" of whippits. There was evidence in the record that this meant he used 25 to 50 canisters. He claimed that he had not used any drugs the day of the killings.

At trial, defendant presented an insanity defense. Through the testimony of family members and a friend, defendant elicited evidence of his bizarre statements and drug use during the years leading up to the killings. Defendant's older brother, James Hallam, testified that defendant had a history of abusing drugs that began when defendant started abusing his Ritalin at the age of 15. According to James, defendant started acting differently once he started abusing drugs and defendant also started having false memories about past family events. James testified that, like defendant, he had also been raised by the victims and that they had treated both James and defendant well as children. James denied ever being subjected to any kind of abuse. Defendant had also told James that he used marijuana wax.

Christopher Dormanen, who was defendant's uncle and the son of the victims, also testified that defendant had been incorrectly remembering events and acting irrationally. Christopher's wife, Mallory Dormanen, testified that defendant had been using drugs.

Defendant's friend, Eric Hart, testified that he and defendant would "hang out" frequently and "smoke a lot of marijuana" together. According to Hart, defendant especially liked to use marijuana wax, which Hart explained was a more concentrated and highly potent form of marijuana. Hart started to notice a change in defendant's behavior in approximately October 2020. Hart testified that defendant "was prophesying, like doomsday, and talking about infinite possibilities, and stuff like that." Defendant would make these types of statements both when he was intoxicated and when he was not intoxicated. Hart stated that defendant had called him the night before the killings, talked about going to a nightclub, and then made "hyena noises" before ending the call.

-3-

The defense expert, forensic psychologist Dr. Thomas Shazer, performed an independent examination of defendant and reviewed various materials from the case, including recordings of defendant's 911 calls and interactions with the police on the day of the killings. Dr. Shazer testified that there was "overwhelming" evidence that on the day of the offenses, defendant was "delusional," meaning that he had a "thought disorder" that involved "grossly unrealistic" beliefs and that impaired his ability to recognize reality. Thus, he opined that defendant met the statutory criteria for having a mental illness and that the best diagnosis for defendant's condition was schizophrenia.

Dr. Shazer next considered whether defendant's condition was the result of voluntary intoxication by alcohol or drugs. Dr. Shazer noted that defendant had reported regularly using alcohol, marijuana, and nitrous oxide during the time leading up to the offenses, that defendant had denied using any substances on the day of the offenses, and that a blood sample taken after defendant was arrested tested positive for the presence of the psychoactive ingredient in marijuana. The blood test was negative for alcohol. Furthermore, according to Dr. Shazer,

> Nitrous oxide, leaves your system really quickly. Actually, I don't think they -- the (indiscernible) even test for them. Marijuana, on the other hand, cannabinoid compounds, stay if one is a heavy user, a daily user, that person can test positive for marijuana weeks after their last use of the drug.

> But, so, what the lab tests tell us, is, well, they don't tell us anything about whether he was using nitrous oxide that day. He probably wasn't using alcohol, since he was negative for alcohol. He -- he had been using marijuana at some point prior to his arrest, but the fact that he tested positive on that day, does not mean that he was under the influence of marijuana that day, or that he consumed any that day.

Dr. Shazer also testified that, when being interrogated by the police on the day of the offenses, defendant "wasn't slurring his speech, he wasn't, you know, he wasn't euphoric like he might be if he were intoxicated on marijuana," and there "was nothing in that recording that made me think that he might have been under the influence at that time." Additionally, Dr. Shazer testified that defendant's medical record from the jail contained notations that defendant made "apparently delusional statements" that his grandparents sexually abused him, conducted satanic rituals, and were freemasons. Dr. Shazer testified that these statements would have been made at a time that defendant was not using substances due to being in jail.

Dr. Shazer concluded that defendant's delusions and psychotic symptoms were not the result of intoxication or withdrawal from substance use, but instead demonstrated mental illness, because he continued to suffer from those psychotic symptoms long after any effects of intoxication or withdrawal would have subsided and before he started taking antipsychotic medication. Her further noted that defendant's delusions appeared to diminish after a period on antipsychotic medication. Alternatively, because defendant's delusions began well before the offenses and persisted more than a month after he could have last used any substances, Dr. Shazer opined that defendant's delusions consisted a "settled condition," even if they were ultimately the product of prolonged substance abuse, and that such a "settled condition" could be the basis for a finding of insanity. Dr. Shazer also concluded that defendant's delusions rendered him unable to

-4-

appreciate the wrongfulness of his acts, or the nature and quality of his conduct, because defendant believed he needed to kill his grandparents to prevent them from further abusing him.

In addressing defendant's assertions regarding his claim of legal insanity, the prosecution presented the testimonies of Dr. Candyce Shields, a forensic psychologist at the Center for Forensic Psychiatry (CFP), and Dr. Lisa Anacker, a staff psychiatrist and forensic examiner at CFP. In January 2022, Dr. Shields administered two psychological tests—the Minnesota Multiphasic Personality Inventory, third edition (MMPI3), and the Structured Inventory of Reported Symptoms, second edition (SIRS2)—to defendant to help determine whether he was malingering relative to his claimed mental illness. According to Dr. Shields, defendant's responses on the MMPI3 indicated that he was exaggerating his symptoms of psychopathology because his score on the "infrequent psychopathology response" scale "suggested that he reported such a level that is much more than individuals who have genuine psychiatric problems actually score on that particular scale." Defendant's responses thus invalidated the test results and rendered the scores on the substantive scales of the test uninterpretable. Dr. Shields ultimately concluded from defendant's responses on the SIRS2, after interpreting those results under both the current and former interpretation methodologies, that defendant was feigning his mental illness symptoms.

Dr. Anacker testified that she completed a criminal responsibility evaluation for defendant. She met with him for the first time in December 2021, and she described defendant as presenting with organized speech and coherent thoughts. Dr. Anacker testified that defendant did not appear to be responding to internal stimuli but that he reported a "large quantity" of delusional thoughts about a variety of subjects. Dr. Anacker stated, "What I became concerned about during that first evaluation was the sheer quantity of what Mr. Hallam was reporting, combined with not observing any other signs or symptoms of severe mental illness." According to Dr. Anacker, the delusions in a patient with a delusional disorder are typically limited to single type of delusion while defendant's delusions ranged over a variety of categories. Dr. Anacker further testified that unlike defendant, a person with schizophrenia will typically exhibit other symptoms in addition to delusions.

With respect to the 911 recordings and police body camera video from the day of the incident, Dr. Anacker conceded that defendant was "not normal" at that time. However, Dr. Anacker determined from witness statements and documentation about defendant in the year leading up to the killings that defendant was exhibiting bizarre behavior combined with the abuse of substances that can mimic that behavior, including marijuana wax and nitrous oxide. She explained that tetrahydro cannabinol (THC) is the psychoactive part of marijuana and that

> THC in and of itself, depending on how much you're using, the concentration of THC, can cause psychosis even in healthy individuals. But, marijuana wax specifically, is a concentrated cannabis extract with concentrations of THC up to 90 percent. And, as the concentrations of THC increase, the higher the chance it is to have symptoms such as paranoia, psychosis, hallucinations, and delusions.

Dr. Anacker indicated that the use of high concentrations of THC could cause symptoms that mimic psychosis. She also found the level of THC in defendant's blood on the day of the offenses "significant," explaining as follows:

So, most of the time when we look at a drug screen, we look at the substance, and we say, oh, it was positive for marijuana. But, the level I also found was significant in Mr. Hallam's case. So, Mr. Hallam's blood drug screen resulted in ten nanograms per milliliter of active THC, which like we mentioned, active THC is what causes the psychoactive part of the symptoms of marijuana. So, it can cause psychosis, it can cause hallucinations, it can cause delusions.

According to Dr. Anacker, "Ten nanograms per milliliter medically, is a very elevated amount" of THC, and she opined that such an amount "could certainly have caused impairment."

With respect to whippits, Dr. Anacker explained as follows:

So, whippits aren't as well known to people as some other substances of abuse. Whippits are a slang term for using nitrous oxide. Nitrous oxide is an odorless gas, it's used as a medical anesthetic if anyone has ever had their wisdom teeth out and gets laughing gas, that's what nitrous oxide is.

However, it's also available as a consumer product in canisters called whippits, that are used in whipped cream canisters, it's where the name comes from. So, nitrous oxide acts as the propellant in those whipped cream canisters.

But, if you are going to use nitrous recreationally, you puncture the canister, inhale the gas, and it causes a temporary oxygen deprivation in your brain, which then can produce a high. And, the high is very quick on, and that's what makes it so addictive.

There has been studies literature that suggest that with increase in use of nitrous oxide, especially at increasing amounts, that nitrous oxide can also cause psychotic symptoms, including in many case studies, specifically delusional symptoms.

So, when I interviewed Mr. Hallam, Mr. Hallam had told me that prior to the offenses, he had begun using nitrous oxide. He told me he used it, I believe, three to four times in the month prior to the alleged -- to the offenses. And, that he was using 40 to 50 canisters at a time when he would use this substance.

When we look directly at the time of the offense, nitrous oxide does not show up in drug screens. It's not typically detected, so the fact that it is not in the drug screen to me is not a point of data that precludes that he was using it at around that time.

His self report is also to me not as reliable, because he told different things about his nitrous oxide use to different people. He had told me he had used it four days prior, but he told police during his police interview that he used the night before. And, when I reviewed the independent medical evaluator's report, I believe he told them he never used it.

So, his self report to me is not something that I could go off of. Instead, knowing that nitrous oxide was used, and that it can cause psychosis, combined with this very potent marijuana substitute that he is using, knowing that that can cause psychosis as well, to me, that's why I believe it's most like[ly] that at the time of the offenses, any sort of symptoms that he was having were primarily due to substance use.

However, she opined that defendant did not have a "settled condition" as a result of his drug abuse, explaining as follows:

I did consider whether he had a settled condition. And, my opinion was that he did not. And, the reason that I said that is because if the condition was settled, if what was going on was due to a substance and then persisted long after the effects of intoxication or withdrawal went away, then why are Mr. Hallam's test results showing feigning and malingering? Why is he not exhibiting symptoms of psychosis that I would expect if he truly was psychotic?

If someone has a settled condition, it means they continue to have those psychotic symptoms that they exhibited at the time of the offense. And, in my opinion, the symptoms that Mr. Hallam exhibited subsequent to the offense, were feigned. The symptoms that he exhibited prior to the offense, in my opinion, we[re] due to those substances of abuse, one of which is concentrated THC, and the other which I can speak about, is nitrous oxide.

* * *

Because when I saw him in both December and in January, he was not exhibiting any actual symptoms of psychosis, other than his self reported symptoms, which again were not clinically consistent with what I would have expected for someone with a genuine mental illness. And, then, again, the testing results also suggested feigning.

So, if someone had a settled condition, again, I would have expected genuine symptoms there after the offenses.

Dr. Anacker opined that defendant did not have a mental illness as defined by the statute because his behavior and symptoms on the day of the offense was the result of voluntary intoxication by substances he was abusing. She also opined that defendant knew the nature and quality of his actions on the day of the offenses, understood the wrongfulness of his actions, and was capable of conforming his conduct to the requirements of the law.

As previously stated, the jury found defendant guilty of two counts of first-degree premeditated murder. This appeal followed.

## II. ANALYSIS

### A. CHALLENGES TO THE TESTIMONY OF DR. ANACKER

On appeal, defendant first challenges Dr. Anacker's opinion that his apparent delusions and psychotic behavior at the time of the offenses stemmed from voluntary intoxication with various substances. Dr. Anacker also suggested that defendant feigned mental illness after the offenses, which implies that defendant could not be found legally insane in support of his asserted insanity defense. Defendant further argues that Dr. Anacker overstepped his role by instructing the jury on legal matters and by claiming that defendant was lying about his mental symptoms. However, despite defendant's attempts to frame his appellate argument as claims of Dr. Anacker overreaching, he is primarily expressing disagreement with Dr. Anacker's opinions and with the jury's apparent choice to credit Dr. Anacker's views over those of Dr. Shazer. Essentially, then, defendant's argument amounts to a claim that the jury's verdict was against the great weight of the evidence.

To provide context for our analysis, we begin with the basic legal contours of the insanity defense. The defense is defined in MCL 768.21a, which provides in relevant part as follows:

> (1) It is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness as defined in section 400 of the mental health code, 1974 PA 258, MCL 330.1400, . . . that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. Mental illness . . . does not otherwise constitute a defense of legal insanity.

> (2) An individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances.

> (3) The defendant has the burden of proving the defense of insanity by a preponderance of the evidence.

Pursuant to MCL 330.1400(g), a mental illness is defined as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life."

Thus, because the law presumes a defendant's sanity, and because a defendant has the burden of proving the affirmative defense of legal insanity by a preponderance of the evidence, a defendant asserting an insanity defense is "required to come forward with evidence substantiating that more likely than not [the defendant] was legally insane when [the defendant] committed the crime." *People v Evans*, 335 Mich App 76, 85; 966 NW2d 402 (2020). The prosecution does not have the burden to prove the defendant's sanity or otherwise establish that the affirmative defense has failed, "[a]nd if a defendant produces sufficient evidence of the elements of [an affirmative] defense, then the question whether the defendant has asserted a valid defense is for the jury to decide." *Id*. (quotation marks and citation omitted; second alteration in original).

-8-

In his appeal, defendant challenges the validity of Dr. Anacker's assessment, particularly the conclusion that defendant did not suffer from a mental illness due to the influence of voluntary intoxication. Defendant asserts that this opinion contradicts established facts within the record and lacks robust evidential support. This contention highlights a fundamental dispute regarding the interpretation and significance of evidence related to the concept of legal insanity. The argument essentially revolves around differing perspectives on how the evidence should be weighed and assessed in the context of mental health evaluations and criminal responsibility. Simply stated, defendant's argument amounts to a disagreement over the strength and weight of the evidence regarding legal insanity.

"A verdict is against the great weight of the evidence and a new trial should be granted when the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result." *People v Solloway*, 316 Mich App 174, 182-183; 891 NW2d 255 (2016) (quotation marks and citation omitted). "[I]n general, conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *People v Lemmon*, 456 Mich 625, 643; 576 NW2d 129 (1998) (quotation marks and citation omitted). "Generally, a verdict is against the great weight of the evidence only when it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *Evans*, 335 Mich App at 87 (quotation marks and citation omitted). "[A]bsent exceptional circumstances, issues of witness credibility are for the jury, and the trial court may not substitute its view of the credibility for the constitutionally guaranteed jury determination thereof." *Lemmon*, 456 Mich at 642 (quotation marks and citation omitted). "[W]hen testimony is in direct conflict and testimony supporting the verdict has been impeached, if it cannot be said as a matter of law that the testimony thus impeached was deprived of all probative value or that the jury could not believe it, the credibility of witnesses is for the jury." *Id*. at 643 (quotation marks and citation omitted). "[A] jury is entitled to disbelieve an expert witness's testimony, even though the testimony is unrebutted or uncontradicted by other expert testimony." *Evans*, 335 Mich App at 86.

Defendant first asserts that Dr. Anacker's opinion was legally erroneous because "[n]itrous oxide or 'whippits' does not contain alcohol and is not a controlled substance" and the "Legislature plainly did not intend to prevent a person from being deemed legally insane 'solely because of being under the influence of'" nitrous oxide and other potentially intoxicating substances that are not alcohol or a controlled substance."

Defendant quotes MCL 768.21a(2). As previously stated, this statutory provision states that "[a]n individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances." The statute does not define "controlled substances."

"[T]he insanity defense as established by the Legislature is the sole standard for determining criminal responsibility as it relates to mental illness or retardation." *People v Carpenter*, 464 Mich 223, 241; 627 NW2d 276 (2001). In *Carpenter*, our Supreme Court held that "by enacting a comprehensive statutory scheme setting forth the requirements for and the effects of asserting a defense based on . . . mental illness . . ., the Legislature has signified its intent

not to allow a defendant to introduce evidence of mental abnormalities short of legal insanity to avoid or reduce criminal responsibility by negating specific intent." *Id*. at 226.

"[A]n individual who is voluntarily intoxicated does not have grounds for an absolute defense based upon his insanity." *People v Caulley*, 197 Mich App 177, 187; 494 NW2d 853 (1992); see also MCL 768.21a(2). "The one exception to this is if the voluntary continued use of mind-altering substances results in a settled condition of insanity before, during, and after the alleged offense." *Id*. at 187 n 3, citing *People v Conrad*, 148 Mich App 433, 438-441; 385 NW2d 277 (1986). This Court has explained further that "[i]ntoxication has been defined as a 'disturbance of mental or physical capacities resulting from the introduction of any substance into the body' " and that "[v]oluntary or self-induced intoxication is 'caused by substances which the defendant knows or ought to know have the tendency to cause intoxication and which he knowingly introduced or allowed to be introduced into his body. . . .' " *Caulley*, 197 Mich App at 187 (citations omitted; ellipsis in original). In *Conrad*, this Court held that "if a defendant is actually and demonstrably rendered insane by the ingestion of mind-altering substances, an insanity defense is not absolutely precluded." *Conrad*, 148 Mich App at 441.[2]

Evidence presented at trial indicates that nitrous oxide was knowingly abused by defendant. In accessing defendant's voluntary intoxication levels, Dr. Anacker relied on defendant's intoxication—stemming from either nitrous oxide, marijuana, or both—as a basis to conclude that defendant was not legally insane. Thus, contrary to defendant's argument on appeal, it was not legally erroneous for Dr. Anacker to rely on her finding that defendant was intoxicated—whether by nitrous oxide or marijuana or a combination of both—to support her finding that defendant was not legally insane at the time of the offenses because his psychotic symptoms were the result of voluntary intoxication. *Caulley*, 197 Mich App at 187; see also *People v Langworthy*, 416 Mich 630, 635; 331 NW2d 171 (1982) (defendant asserted insanity and intoxication defenses, presenting "expert testimony regarding his mental state as well as evidence that he had been sniffing glue and drinking alcohol immediately prior to the crime").

Defendant further argues that there were no facts in evidence to support Dr. Anacker's opinion that he was under the influence of at least marijuana and nitrous oxide at the time of the killings. Defendant asserts that the evidence showed that he was not under the influence of any substances at that time. However, in making this argument, defendant ignores Dr. Anacker's testimony that her medical training included "training on the variety of substances of abuse; their metabolism, their effects of intoxication, and withdrawal." Although defendant acknowledges that defendant's blood test revealed the presence of THC, defendant also ignores Dr. Anacker's testimony that the amount of *active* THC in defendant's blood was "very elevated" and could cause symptoms of psychosis such as hallucinations and delusions. Furthermore, Dr. Anacker explained

---

[2] *Conrad* was decided before November 1, 1990, so it is not binding on this Court. *People v Bensch*, 328 Mich App 1, 7 n 6; 935 NW2d 382 (2019), lv den 505 Mich 859 (2019). "However, while we are not strictly required to follow uncontradicted opinions from this Court decided before November 1, 1990, those opinions are nonetheless considered to be precedent and entitled to significantly greater deference than are unpublished cases." *Id*. (quotation marks and citation omitted).

the basis for her conclusion that defendant was intoxicated, rather than suffering from a mental illness at the time of the offenses, as follows:

> [K]nowing that nitrous oxide was used, and that it can cause psychosis, combined with this very potent marijuana substitute that he is using, knowing that that can cause psychosis as well, to me, that's why I believe it's most like [sic] that at the time of the offenses, any sort of symptoms that he was having were primarily due to substance use.

Defendant's argument suggesting that an alternative conclusion could have been reached concerning the significance of the THC concentration in his blood constitutes an attempt to improperly seek a retrial on appeal. This assertion does not substantiate the claim that the verdict was contrary to the great weight of the evidence. Furthermore, mere disagreements regarding the interpretation of conflicting evidence do not establish that the verdict is against the great weight of the evidence. *Lemmon*, 456 Mich at 643.

Defendant also complains about whether certain statements in Dr. Anacker's testimony, and her interpretation of various evidence in the record, was objectively correct from a medical perspective. However, defendant does not provide any binding legal authority supporting his contentions, nor does defendant provide any legal analysis and supporting legal authority demonstrating an error requiring appellate relief. This argument is abandoned. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

Moreover, defendant presented evidence, including expert testimony, supporting his theory that defendant was not under the influence of nitrous oxide or any other substances at the time of the offenses and that even if his psychotic symptoms were the result of prolonged substance abuse, those symptoms constituted a "settled condition" on which a finding of legal insanity could be predicated. The jury resolved this conflicting evidence, there is ample evidence supporting the verdict reached by the jury, and we cannot conclude that the evidence preponderates heavily against the verdict; defendant therefore has not shown that the verdict was against the great weight of the evidence. *Lemmon*, 456 Mich at 643; *Solloway*, 316 Mich App at 182-183.

Next, defendant argues that Dr. Anacker improperly provided instructions to the jury on the law related to the insanity defense. Defendant cites testimony where Dr. Anacker referred to the statutory definition of legal insanity and argues that Dr. Anacker mischaracterized the definition for a settled condition by stating that it required permanent changes to have occurred to defendant's brain. As defendant concedes, defendant did not object to this testimony at trial and our review of this unpreserved claim of error is thus for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). To establish plain error, a defendant must show that (1) error occurred; (2) the error was plain, meaning clear or obvious; (3) and the plain error was prejudicial, meaning that it "affected the outcome of the lower court proceedings." *Id*. at 763. Even if these three requirements are satisfied, reversal is only warranted if the defendant is actually innocent or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id*. at 763-764.

-11-

In *People v Drossart*, 99 Mich App 66, 73; 297 NW2d 863 (1980), this Court addressed the question whether an expert witness's opinion testimony regarding a defendant's alleged mental illness or insanity was "incompetent because it addresse[d] a question of law, thereby invading the province of the judge and jury." The Court stated the rule that a "witness who is qualified as an expert on the subject of insanity may state his opinion of a person's mental condition upon the basis of observation, a hypothetical question, or the testimony of other witnesses," and clarified that "[o]pinion evidence of this sort is not objectionable merely because it embraces an ultimate issue of fact to be decided by the jury." *Id*. (quotation marks and citation omitted). The issue was then framed as follows:

> It is important to note, therefore, that a qualified witness may testify that the accused is suffering from a mental condition involving "substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life". In addition, the opinion rule does not prevent that witness from concluding that, as a consequence of the above mental condition, the accused "lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law". The question which remains is whether the expert witness can go one step further, proceeding to opine that because defendant suffered from some or all of the foregoing mental conditions resulting in "mental illness", he was "insane" at the time of the alleged offense.

> *   *   *

> The concept of mental illness and insanity suggests references to the medical and psychiatric sciences. Still, we have little difficulty in concluding that the definition used to describe those terms, at least for purposes of avoiding criminal responsibility, must come from the law. Hence, when the issue of insanity is raised in a criminal case, the trial court has the responsibility to properly charge the jury on the elements of the defense. Once instructed on the issue, however, the jury or trier of fact is required to decide the ultimate issue of the defendant's sanity at the time of the offense. While the expert knowledge of psychiatrists and psychologists can be of assistance to the jury in arriving at their determination, the jury has the sole responsibility of applying the given rules of law to the facts relating to the defendant's mental condition.

> Although the ultimate issue rule no longer stands in the way of expert testimony stating opinions on crucial questions to be decided by the trier of fact, it is important that the expert witness not be permitted to testify about the requirements of law which apply to the particular facts in the case or to phrase his opinion in terms of a legal conclusion. In the former case, the claim is that the province of the judge is invaded, while in the latter, the contention is that the province of the jury is invaded. [*Id*. at 74-75 (citations omitted).]

Here, to the extent defendant complains about instances where Dr. Anacker referred to statutory definitions of insanity and mental illness, defendant has not shown any error. "Generally, the witness should state his opinion of the defendant's mental condition in his own language and

by such ordinary and professional forms of expression as will best convey his own ideas of the matter," but "if, in expressing his ideas and opinion on the matter, the witness refers to legal standards properly explained by the trial court or examining attorney, there can be no danger of usurping the role of the trial judge to deal with questions of law." *Id*. at 77.

However, to the extent defendant complains about the prosecution eliciting explanations and definitions of the statutory terms, defendant is correct that plain error occurred. "[A] medical expert's opinion as to the applicable law of criminal responsibility for insanity is of no aid to the jury and could possibly confuse them in light of their duty to apply the law solely as explained by the judge at the end of the case." *Id*. at 76. More specifically, this Court has explained that "a psychiatrist or psychologist may testify that a defendant was or was not insane when he performed the act in question," but "an expert's opinion as to the law of criminal responsibility or insanity is of no aid to the jury, and could possibly confuse them." *Caulley*, 197 Mich App at 193. Furthermore, "it is clear that an expert may testify regarding the accused's ability to conform his conduct to the demands of the law, and may even testify that, in his opinion, the defendant was mentally ill or insane. However, an expert witness may not provide a definition of these legal terms for the jury." *Id*. Thus, testimony explaining the law of the insanity defense and defining applicable terms is inadmissible. *Id*.; *Drossart*, 99 Mich App at 76-77. Notably, it is the prosecutor's error to the extent the prosecutor asks questions of the expert witness that elicit this improper testimony on the applicable law; the prosecutor in the present case committed precisely this error.[3] *Caulley*, 197 Mich App at 194 ("In this case, the prosecutor erred in questioning his experts about what the law requires for insanity.")

Nonetheless, defendant must still show the requisite prejudice. *Carines*, 460 Mich at 763. At the conclusion of trial, the trial judge stated to the jury that the judge would "now instruct you on the law," that the judge would "explain the law that applies to this case," and that the jurors had "taken an oath to return a true and just verdict based only on the evidence and my instructions on the law." The judge expressly instructed the jury, "You must take the law as I give it to you." Additionally, the judge provided instructions on the defense of legal insanity, defining the term legal insanity and mental illness. The judge also instructed the jury that "a person is not legally insane just because he voluntarily -- just because he was voluntarily intoxicated by alcohol or drugs at the time of the crime" and that a "person can become legally insane by the voluntary continued use of mine [sic] altering substances like alcohol or drugs if their use results in a settled condition of insanity before, during, or after the alleged offense."

"[E]ven if somewhat imperfect, [jury] instructions do not create error if they fairly presented the issues for trial and sufficiently protected the defendant's rights." *People v Spaulding*, 332 Mich App 638, 653; 957 NW2d 843 (2020) (quotation marks and citation omitted). In this case, beyond merely asserting that the trial court's instructions to the jury did not correct Dr. Anacker's alleged misstatements of law, defendant does not explain how the trial court's jury instructions did not accurately reflect the law or were otherwise somehow erroneous. "Jurors are

---

[3] The prosecutor asked Dr. Anacker, "can you start to explain the process of determining someone to be legally insane? What is the first prong of that?" Dr. Anacker responded with her explanation of how to read the pertinent statute.

-13-

presumed to follow their instructions, and jury instructions are presumed to cure most errors." *People v Zitka*, 335 Mich App 324, 348; 966 NW2d 786 (2020) (quotation marks and citation omitted). Defendant has therefore failed to meet his burden to show that his forfeited claims of error affected the outcome of the trial, and reversal is therefore not warranted under these circumstances. *Carines*, 460 Mich at 763.

To the extent defendant has asserted additional arguments expressing his disagreement with Dr. Anacker's expert opinions, and attempting to relitigate the merits of those opinions, defendant has not demonstrated that the evidence preponderates so heavily against the verdict that the verdict was against the great weight of the evidence. *Solloway*, 316 Mich App at 182-183. "It is the province of the jury to determine questions of fact and assess the credibility of witnesses." *Lemmon*, 456 Mich at 637.

Defendant further argues that his trial counsel provided ineffective assistance by failing to correct Dr. Anacker's improper testimony regarding insanity law. "To establish a claim of ineffective assistance of counsel, the defendant must show that counsel's performance was deficient and that there is a reasonable probability that, but for the deficiency, the factfinder would not have convicted the defendant." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008) (quotation marks and citation omitted). However, in light of our conclusion that any error was corrected by the jury instructions, even presuming that trial counsel was ineffective as described by defendant in his brief on appeal, defendant has not shown how he was prejudiced by the lack of further corrective action by defense counsel in this regard. Defendant thus has not demonstrated that he was denied the effective assistance of counsel. *Id.*

## B. TESTIMONY ON MALINGERING

Next, defendant argues that the expert witnesses should not have been permitted to testify that he was lying or malingering regarding his symptoms of mental illness. Defendant contends that such testimony amounts to improper expert testimony regarding defendant's credibility similar to evidence of a polygraph test.

In making this argument, defendant first attacks testimony given by his own expert, Dr. Shazer, in response to questions by the prosecution during cross-examination. The prosecution elicited testimony from Dr. Shazer that Dr. Shazer believed defendant was exaggerating his symptoms when Dr. Shazer spoke to defendant in April 2022, which was several months after the offenses. However, Dr. Shazer also subsequently explained that this did not mean that defendant was fabricating his delusional symptoms at the time of the offenses, which is the pertinent time to consider under MCL 768.21a. There was no objection to the prosecutor's questioning or the testimony elicited of which defendant now complains, so our review is for plain error. *Carines*, 460 Mich at 763-764.

Although we can glean that defendant intends to argue on appeal that Dr. Shazer's cross-examination testimony somehow amounted to improper comments on defendant's credibility, it is difficult to understand how any of this testimony was prejudicial considering that Dr. Shazer consistently explained how it did not actually undermine his conclusion that defendant was legally insane on the day of the killings, thereby supporting defendant's theory at trial. Defendant does not cogently explain how he was prejudiced as a result of any error in this regard. *Id*. at 763.

Instead, defendant leaves it to this Court to attempt to fit his general complaints about how Dr. Shazer's testimony *could* have been understood by the jury in a manner unfavorable to defendant into a legal theory that would entitle him to appellate relief. As we have already stated, this type of argument does not warrant relief, and it is not the role of this Court to create defendant's arguments for him. *Kelly*, 231 Mich App at 640-641.

Defendant next challenges the testimony of Dr. Shields and Dr. Anacker regarding the psychological tests administered to defendant on which these two witnesses based their opinions that defendant was malingering regarding his mental health symptoms. Defendant, also more generally, challenges the testimony that he was malingering. However, defendant's argument actually focuses more on his apparent disagreement with the experts' views of the evidence and the conclusions they reached. As with defendant's other arguments in this vein, he again has not demonstrated that the verdict was against the great weight of the evidence on this basis because he merely argues for a different resolution of conflicting evidence. *Lemmon*, 456 Mich at 643; *Solloway*, 316 Mich App at 182-183.

Moreover, expert testimony about data gathered through psychological testing performed on a defendant is not inherently inadmissible. *People v Kowalski*, 492 Mich 106, 136; 821 NW2d 14 (2012) (opinion by MARY BETH KELLY, J.). We acknowledge that opinion testimony on a defendant's guilt or innocence is generally improper, *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985), and it is well settled that evidence regarding the results of a polygraph test is inadmissible because of the risk that "the trier of fact will give disproportionate weight to the results and consider the evidence as conclusive proof of guilt or innocence," *People v Dobek*, 274 Mich App 58, 97; 732 NW2d 546 (2007) (quotation marks and citation omitted). However, when an insanity defense has been raised, a witness qualified as an expert on matters relating to mental illness and insanity may provide an opinion on a defendant's mental condition, whether the defendant had a mental illness, and whether the defendant lacked the substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law as a result of mental illness. *Drossart*, 99 Mich App at 73-74. These experts are "not precluded from giving opinions related to the ultimate issue in fact on the ground that to do so would invade the province of the jury," and thus may testify to an opinion whether the defendant "was or was not 'mentally ill' or 'insane' at the time of the alleged offense." *Id*. at 80, 82.

"Psychologists and psychiatrists are not, and do not claim to be, experts at discerning truth." *People v Beckley*, 434 Mich 691, 728; 456 NW2d 391 (1990) (opinion by BRICKLEY, J.) (quotation marks and citation omitted). "Indeed, statements which are untrue, and which [an] examining psychologist knows to be untrue, may nevertheless serve as a basis for accurate diagnosis and treatment." *People v LaLone*, 432 Mich 103, 110; 437 NW2d 611 (1989) (opinion by BRICKLEY, J.). Our Supreme Court has observed that "those in the mental health profession generally work with statements that are both true and untrue in diagnosing and treating a patient for a mental disorder." *Beckley*, 434 Mich at 728 (opinion by BRICKLEY, J.) Here, defendant has not shown that there was any error in permitting the experts to discuss which of defendant's

descriptions of symptoms may or may not have been accurate as part of their respective discussions whether he met the definition of legal insanity. *Carines*, 460 Mich at 763.[4]

Defendant also advances two additional related claims of ineffective assistance of counsel, arguing that his trial counsel was ineffective for failing to exclude the testimony related to defendant's malingering and for failing to exclude Dr. Anacker's testimony that defendant was under the influence of nitrous oxide. However, as we have already explained, defendant has not demonstrated that this testimony was inadmissible. Defendant therefore has not shown that his trial counsel performed deficiently by not seeking to exclude that evidence. *Unger*, 278 Mich App at 242.

## C. CHARACTER EVIDENCE

Next, defendant argues that the evidence of defendant's drug and alcohol use was inadmissible pursuant to MRE 404. As defendant admits, he did not object to this evidence on this ground. Our review is thus for plain error. *Carines*, 460 Mich at 763-764.

At the time of trial,[5] MRE 404 provided in relevant part as follows:

> (a) Character Evidence Generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:

> (1) Character of Accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same . . .

> * * *

> (b) Other Crimes, Wrongs, or Acts.

> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

Accordingly, as this Court has explained:

---

[4] Defendant concedes on appeal that there was no objection to the expert testimony he alleged was improper.

[5] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of trial.

MRE 404(a) prohibits the introduction of evidence concerning a person's character "for the purpose of proving action in conformity" with that character. Similarly, MRE 404(b)(1) prohibits the introduction of evidence concerning "other crimes, wrongs, or acts" in order to "prove the character of a person in order to show action in conformity therewith." Thus, a prosecutor may not normally call witnesses to testify about a defendant's character or present evidence of other acts performed by the defendant in order to show that the defendant has a particular character and that the defendant acted in conformity with his or her character with regard to the events at issue. MRE 404(a); MRE 404(b)(1). [*People v Roper*, 286 Mich App 77, 91; 777 NW2d 483 (2009).]

Nonetheless, despite this general prohibition, other-acts evidence that implicates character may be admissible for a proper non-character purpose. *Id*. at 92.

Here, defendant argues that evidence of his drug and alcohol use was admitted solely for the improper purpose of showing his propensity for bad acts involving substance abuse and that this evidence was therefore inadmissible under MRE 404. However, the primary issue at defendant's trial was whether defendant was legally insane at the time of the killings and evidence was relevant for the purpose of showing that defendant was actually intoxicated at that time, rather than legally insane. This is a proper non-character purpose. MRE 404 is not implicated when evidence is admitted for "a purpose other than to establish action in conformity with character." *Id*., citing *People v VanderVliet*, 444 Mich 52, 64-65; 508 NW2d 114 (1993), as amended by 445 Mich 1205 (1994).

Contrary to defendant's characterization of this evidence as propensity evidence, the evidence was not used for the character or propensity purpose of demonstrating that defendant must have committed the murders because he was a "bad" person as a result of his pattern of substance abuse. Defendant is incorrect that there was no purpose for this evidence other than an improper propensity purpose. "The question is not whether the evidence falls within an exception to a supposed rule of exclusion, but rather whether the evidence [is] in any way relevant to a fact in issue other than by showing mere propensity." *VanderVliet*, 444 Mich at 64 (quotation marks and citation omitted; alteration in original). MRE 404 is a rule of inclusion rather than exclusion. *Id*. "Relevant other acts evidence does not violate Rule 404(b) unless it is offered solely to show the criminal propensity of an individual to establish that he acted in conformity therewith." *Id*. at 65. "Properly understood, MRE 404(b) is a nonexclusive list of examples of situations in which the general rule excluding character evidence, MRE 404(a), is not offended because the evidence is probative of some fact other than the defendant's criminal propensity." *Id*. at 66 (quotation marks and citation omitted).

Defendant therefore has not demonstrated any plain error. *Carines*, 460 Mich at 763. Defendant has not adequately developed any argument regarding the other three prongs of the standard for admission of evidence under MRE 404(b).[6] Thus, any arguments related to those

---

[6] See *People v Denson*, 500 Mich 385, 398; 902 NW2d 306 (2017) (" 'First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as

prongs are abandoned. *Kelly*, 231 Mich App at 640-641. Similarly, because defendant has not shown that this evidence was inadmissible, his argument that his trial counsel was ineffective for not objecting on the basis of MRE 404 is without merit. *Unger*, 278 Mich App at 242.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Kirsten Frank Kelly
/s/ Stephen L. Borrello

---

enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury.' "), quoting *VanderVliet*, 444 Mich at 55.